Charles JAMES, Appellant,

v.

The **BOARD OF EDUCATION OF CENTRAL DISTRICT NO. 1 OF the TOWNS OF ADDISON et al.,** Appellees.

No. 697, Docket 72-1109.

United States Court of Appeals,
Second Circuit.

Argued May 5, 1972.

Decided May 24, 1972.

Burt Neuborne, New York City (New York Civil Liberties Union, of counsel), for appellant.

Harry Treinin, Corning, N. Y., for appellees.

John P. Jehu, Albany, N. Y., for Commissioner of Education of State of New York, amicus curiae.

Before KAUFMAN, ANDERSON and MANSFIELD, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The first amendment proscription against any law abridging freedom of expression, perhaps more than any other constitutional guarantee, frequently brings into sharp focus the inexorable tension between enduring concerns for individual freedom and the authority required to preserve the democracy so

crucial to realizing that freedom. For several decades, the courts have struggled with principles and concepts necessary to strike a functional balance between protected speech and the government's legitimate interest in protecting our democracy.[1]

The Supreme Court has more than once instructed that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960), *quoted in* Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 512, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Rightly called the "cradle of our democracy," our schools bear the awesome responsibility of instilling and fostering early in our nation's youth the basic values which will guide them throughout their lives. Appellant is quick to agree that we cannot tolerate undisciplined, coercive, intimidating or disruptive activities on the part of teachers or students which threaten the essential functions of our schools, and that such conduct requires a disciplinary response. But, the issue in this case is whether, in assuming the role of judge and disciplinarian, a Board of Education may forbid a teacher to express a political opinion, however benign or noncoercive the manner of expression. We are asked to decide whether a Board of Education, without transgressing the first amendment, may discharge an 11th grade English teacher who did no more than wear a black armband in class in symbolic protest against the Vietnam War, al-though it is agreed that the armband did not disrupt classroom activities, and as far as we know did not have any influence on any students and did not engender protest from any student, teacher or parent. We hold that the Board may not take such action.

The facts essential to a resolution of the conflicting interests are undisputed. On June 7, 1969, Charles James was employed as an 11th grade English teacher at Addison High School, located near Elmira, New York. He previously had taught in the New York City public schools. After moving to the Elmira area, James, a practicing Quaker, joined the Elmira Meeting of the Religious Society of Friends.

When November 14 and December 12, 1969, were designated as "moratorium" days by the opponents of the Vietnam War, the Elmira Meeting determined to observe the two days by wearing black armbands.[2] On November 14 James affixed one of the armbands, which had been prepared by the Meeting, to the sleeve of his jacket. He since has stated that he "resolved to wear one of the black armbands as an expression of [his] religious aversion to war in any form and as a sign of [his] regret over the loss of life in Vietnam."

Shortly after school began that day, Carl Pillard, the Principal, entered James's homeroom, noticed the armband, but made no comment. Pillard waited until midway through the second period when James was teaching poetry, apparently without any incident or discussion whatsoever relating to Vietnam or the armband, to summon James to his office and to request him to remove the armband. When James refused to re-

1. *See generally,* Kaufman, The Medium, the Message and the First Amendment, 45 N.Y.U.L.Rev. 761 (1970) (The James Madison Lecture).

2. In a statement signed after James had been dismissed, the members of the Elmira Meeting explained their motivation: It is from this religious context [Quaker belief in the futility and immorality of war] that Charles James drew his moral imperative to act as he did, in wearing a black armband—symbol of sympathy and mourning for the dead —on those days accepted nationally as the time to demonstrate for peace and for an end to the killing in Vietnam. His action was as one member of this meeting, along with other members, who chose out of the same deep convictions, to wear a black armband all and every day of the moratoriums.

move it, Pillard sent him to the District Principal, Edward J. Brown. Brown ordered James to remove the armband or risk suspension or dismissal because the armband constituted a symbolic expression of his political views.[3] In addition, Brown feared that "wearing the armband would tend to be disruptive and would possibly encourage pupils to engage in disruptive demonstrations." When James again refused to remove the armband, Brown summarily suspended him and ordered James to leave the school at once.

The following day James received a letter from the Board of Education of Central District No. 1, reinstating him on "the understanding that [he] engage in no political activities while in the school."[4] James resumed his teaching duties, but, steadfastly abiding by his principles, whether religious (Quakers are doctrinally opposed to war) or political in nature, he came to school wearing an armband on December 12, the second moratorium day. He was summarily suspended as soon as Brown learned that James again had worn an armband. Here, too, the record is barren of a scintilla of evidence indicating that there were any incidents or threats to school discipline, that any students or teachers had complained of or were offended by James's first or second symbolic protest, or that the armband constituted more than a silent expression of James's own feelings. On January 13, however, without affording James a hearing, the Board of Education of Central District No. 1 discharged him from his teaching position in accordance with § 3013(1) of the Education Law of New York, McKinney's Consol.Laws, c. 16.[5]

James appealed his dismissal to the New York State Commissioner of Education, Ewald B. Nyquist, asserting that his dismissal infringed upon his first amendment rights and deprived him of due process of law.[6] The "hearing" before the Commissioner, as we were informed at the argument of this appeal, was no more than an informal roundtable discussion between the Commissioner, the parties and their attorneys. No transcript of the proceedings was made. On September 23, 1970, Commis-

3. Brown apparently assured James that there was no question as to his right to hold political views or to participate in political activities outside of school. Controversial issues, he said, should not be discussed in school unless they are relevant to the subject matter being taught and all points of view are objectively presented. He relied in part on a letter of November 3, 1969, from Herbert F. Johnson, Deputy Commissioner of the Department of Education of New York, which set forth the Department's policies with respect to the upcoming moratorium days: "The school posture should be neutral and objective. Administrators and staff members should avoid taking positions on controversial matters which may reflect on the objectivity of the school." In addition, Brown suggested that it was a breach of professional ethics to use the classroom to promote partisan politics. See New York State Teachers Ass'n, Joint Code of Ethics.

4. The letter in full read:
 The Board of Education of Addison Central School District has conferred with counsel and very thoroughly discussed the facts of your situation. The Board has, unanimously, confirmed the action of District Principal Edward J. Brown regarding your suspension on Friday, November 14, 1969.
 The Board deems your action to be a political act. As such, it is prohibited in the School. It is, also, deemed unethical action on the part of a teacher to engage in such activity.
 You may return to class on Monday, November 17, 1969, with the understanding that you engage in no political activities while in the School.
 Of course, the Board recognizes fully your absolute right to express outside of the School any beliefs that you may have.

5. James, in his first year of teaching at Addison, was appointed as a "probationary" teacher. Under the provisions of § 3013(1) of the Education Law of New York, the services of a probationary teacher "may be discontinued at any time during such probationary period, upon the recommendation of the district superintendent, by a majority vote of the board of education or trustees."

6. See Education Law of New York § 310.

sioner Nyquist filed his decision. Although he recognized that a board of education does not have unfettered discretion to dismiss a probationary teacher,[7] he concluded that James had violated "sound educational principles" and that his actions "were not constitutionally protected." In addition, he reaffirmed the Board of Education's absolute right to dismiss a probationary teacher without affording the teacher a hearing or explaining the basis of the discharge.

Thereupon, James instituted this action in the Western District of New York against the Board of Education of Central District No. 1, Edward Brown, Carl Pillard and Robert Andrews, President of the School District Board of Trustees, alleging that his dismissal violated 42 U.S.C. § 1983.[8] Judge Burke, in a brief memorandum, denied James's motion for summary judgment and granted the defendants' motion for a judgment, summarily dismissing the complaint on the merits, seemingly on two grounds: first, that the issues raised by the complaint were *res judicata,* and second, that none of James's federally protected rights was violated.[9]

### I.

At the outset we are presented with the contention that the claims asserted below are *res judicata.* We consider this to be wholly without merit. Appellees argue that James, at his own choosing, was given the full opportunity to litigate his claims before the Commissioner of Education, a "judicial officer" of the State, and therefore that James should be bound by the Commissioner's decision. Judge Burke buttressed their position with a pointed reference to James's failure to appeal the Commissioner's decision to the New York courts.[10]

 It is no longer open to dispute that a plaintiff with a claim for relief under the Civil Rights Act, 42 U.S.C. § 1983, is not required to exhaust state judicial remedies. *See, e. g.,* Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Rodriguez v. McGinnis, 456 F.2d 79 (2d Cir. 1972) (*in banc*); Sostre v. McGinnis, 442 F. 2d 178, 182 (2d Cir. 1971) (*in banc*), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). It is still the law in this Circuit, however, that a Civil Rights plaintiff must exhaust state administrative remedies. Eisen v. East-

---

7. Commissioner Nyquist relied on his earlier decision in Matter of Collins, Decision No. 8051, August 26, 1969:

 While I fully agree that a board of education has broad powers over a probationary teacher and may dismiss a probationer without giving a reason, the exercise of these powers by a board must be made "within the ambit of the purpose for which they were granted and in a manner consistent with our basic Constitutional framework."

 *See also* Puentes v. Board of Education, 24 N.Y.2d 996, 302 N.Y.S.2d 824, 250 N.E.2d 232 (1969), rev'g 24 A.D.2d 628 (1966).

8. 42 U.S.C. § 1983 provides:

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

 James's complaint asserts violations of his rights to free speech, free exercise of religion, procedural due process and equal protection of the laws.

9. In this posture of the proceedings, we must accept all factual allegations in the complaint as true.

10. Although § 310 of the Education Law of New York provides that any decision of the Commissioner "shall be final and conclusive, and not subject to question or review in any place or court whatever," New York courts have reviewed decisions where there is a claim that the decision was arbitrary or an abuse of discretion. *See, e. g.,* Board of Education v. Allen, 6 N.Y.2d 127, 188 N.Y.S.2d 515, 160 N.E. 2d 60 (1959).

man, 421 F.2d 560 (2d Cir. 1969), cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970). It hardly can be suggested that a plaintiff having followed the course laid out by *Eisen*, was to be barred henceforth from pressing his claim to final judicial review or to be deprived of his opportunity to litigate his constitutional claims in the judicial forum of his choice. To adopt the full implication of appellees' argument would be to effect a judicial repeal of 42 U.S.C. § 1983 and strike down the Supreme Court's decision in Monroe v. Pape, *supra.* James would be placed in the paradoxical position of being barred from the federal courts if he had not exhausted administrative remedies and barred if he had.[11]

### II.

We come now to the crucial issue we must decide—did the Board of Education infringe James's first amendment right to freedom of speech?[12]

Any meaningful discussion of a teacher's first amendment right to wear a black armband in a classroom as a symbolic protest against this nation's involvement in the Vietnam War must begin with a close examination of the case which dealt with this question as it applied to a student. Tinker v. Des Moines Independent Community School District, *supra.* Mary Beth Tinker, a junior high school student, her older brother and his friend, both high school students, were suspended from school for wearing black armbands in school to publicize their opposition to the war in Vietnam.

Noting that neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," 393 U.S. at 506, 89 S.Ct. at 736, the Supreme Court held that a school cannot bar or penalize students' exercise of primary first amendment rights akin to "pure speech" without "a showing that the students' activities would materially and substantially disrupt the work and discipline of the school." *Id.* at 513, 89 S.Ct. at 740.

With respect to both teacher and student, the responsibility of school authorities to maintain order and discipline in the schools remains the same. The ultimate goal of school officials is to insure that the discipline necessary to the proper functioning of the school is maintained among both teachers and students. Any limitation on the exercise of constitutional rights can be justified only by a conclusion, based upon reasonable inferences flowing from concrete facts and not abstractions, that the interests of discipline or sound education are materially and substantially jeopardized, whether the danger stems initially from the conduct of students or teachers. Although it is not unreasonable to assume that the views of a teacher occupying a position of authority may carry more influence with a student than would those of students *inter sese,* that assumption merely weighs upon the inferences which may be drawn. It does not relieve the school of the necessity to show a reasonable basis for its regulatory policies. As the Court has in-

11. Appellees' reliance on Judge Weinstein's opinion in Taylor v. New York City Transit Authority, 309 F.Supp. 785 (E. D.N.Y.), aff'd. 433 F.2d 665 (2d Cir. 1970), is misplaced. Judge Weinstein's determination that Taylor could not raise his procedural due process claim in the federal courts, after he had appealed his discharge as a Transit Authority employee to the New York City Civil Service Commission and then the New York courts, was based on Taylor's failure to raise that claim before the administrative agency. The decision was nothing more than a logical extension of Eisen v.

Eastman, *supra,* through the application of traditional notions of merger and bar. Since no transcript of the proceedings before Commissioner Nyquist was made, James cannot be charged with the failure to raise any of his claims. Suffice it to say that appellees conceded at oral argument that the broad range of James's grievances were discussed informally before the Commissioner.

12. In view of our decision, it is unnecessary to reach the claims that the discharge violated his rights to free exercise of religion and equal protection of the laws.

structed in discussing the state's power to dismiss a teacher for engaging in conduct ordinarily protected by the first amendment: "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).[13]

It is to be noted that in this case, the Board of Education has made no showing whatsoever at any stage of the proceedings that Charles James, by wearing a black armband, threatened to disrupt classroom activities or created any disruption in the school. Nor does the record demonstrate any facts "which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities . . . ." Tinker v. Des Moines Independent Community School District, 393 U.S. at 514, 89 S.Ct. at 740. All we can learn from the record is that in the opinion of Edward Brown,

the District Principal, "wearing the armband would tend to be disruptive and would possibly encourage pupils to engage in disruptive demonstrations." "But," the Supreme Court warned in Tinker, "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." [14] Id. at 508, 89 S.Ct. at 737.

■ Appellees urge us not to conclude that schools must wait until disruption is on the doorstep before they may take protective action. We do not suggest this course, but if anything is clear from the tortuous development of the first amendment right, freedom of expression demands breathing room. To preserve the "marketplace of ideas" so essential to our system of democracy, we must be willing to assume the risk of argument and lawful disagreement. Id. at 508–509; Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). This is entirely different, however, from saying that the school must await open rebellion, violence or extensive disruption before it acts. Compare Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966),

13. *Pickering* dealt with the power of the Board of Education to discharge a high school teacher for sending a letter to the local newspaper criticizing the Board and the district superintendent of schools for their fiscal policies. The Board insisted that the letter was disruptive of faculty discipline and would tend to foment "controversy, conflict and dissension" among teachers, administrators and residents of the district. The Court held that the Board had violated the teacher's first amendment rights. Appellees would distinguish *Pickering* by having us draw an arbitrary line between first amendment rights exercised in school and out of school. The distinction is deceptively simple and cannot withstand scrutiny. *See* Goldwasser v. Brown, 417 F.2d 1169 (D.C.Cir.), cert. denied, 397 U.S. 922, 90 S.Ct. 918, 25 L.Ed.2d 103 (1969) (*Pickering* test applies to teacher's classroom speech at Air Force language school). Appellees concede, as they must, that James has a constitutional right to wear a black armband off school premises—every day if he so pleases. But, it is not unreasonable to assume that James,

as a teacher, might gain notoriety for such out-of-school conduct and become a vanguard of the local opposition to the Vietnam War. In that event, one could not divorce his person from the idea, and he would become an embodiment of his symbolic protest no matter where or how he appeared—even if temporarily without his armband. Although we can imagine situations in which a teacher would be so controversial because of his tenets or beliefs that he would be a disruptive force in the school, no one would suggest that he could be dismissed merely because he was *identified* with a particular cause if he did not preach that cause in class.

14. The facts here call more clearly for the protection of James's rights than did those in *Tinker*. In his dissenting opinion in *Tinker*, Justice Black emphasized that "[e]ven a casual reading of the record shows that the armband did divert students' minds from their regular lessons, and that talk, comments, etc., made John Tinker 'self-conscious' in attending school with his armband." 393 U.S. at 518, 89 S.Ct. at 742. The record in this case does not support similar inferences.

*with* Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966).[15]

### III.

That does not end our inquiry, however. The interest of the state in promoting the efficient operation of its schools extends beyond merely securing an orderly classroom. Although the pros and cons of progressive education are debated heatedly, a principal function of all elementary and secondary education is indoctrinative—whether it be to teach the ABC's or multiplication tables or to transmit the basic values of the community. "[S]ome measure of public regulation is inherent in the very provision of public education." Note, Developments in the Law-Academic Freedom, 81 Harv.L.Rev. 1045, 1053 (1968). Accordingly, courts consistently have affirmed that curriculum controls belong to the political process and local school authorities. "Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate constitutional values." Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).[16]

Appellees argue that this broad power extends to controlling a teacher's speech in public schools, that "assumptions of the 'free marketplace of ideas' on which freedom of speech rests do not apply to school-aged children, especially in the classroom where the word of the teacher may carry great authority."

Note, Developments in the Law-Academic Freedom, 81 Harv.L.Rev. at 1053. Certainly there must be some restraints because the students are a "captive" group. But to state the proposition without qualification is to uncover its fallacy. More than a decade of Supreme Court precedent leaves no doubt that we cannot countenance school authorities arbitrarily censoring a teacher's speech merely because they do not agree with the teacher's political philosophies or leanings. This is particularly so when that speech does not interfere in any way with the teacher's obligations to teach, is not coercive and does not arbitrarily inculcate doctrinaire views in the minds of the students. *Cf.* Keyishian v. Board of Regents, *supra.*

As we have indicated, there is merit to appellees' argument that *Tinker* does not control this case, because a teacher may have a far more pervasive influence over a student than would one student over another. Although sound discussions of ideas are the beams and buttresses of the first amendment, teachers cannot be allowed to patrol the precincts of radical thought with the unrelenting goal of indoctrination, a goal compatible with totalitarianism and not democracy. When a teacher is only content if he persuades his students that his values and only his values ought to be their values, then it is not unreasonable to expect the state to protect impressionable children from such dogmatism. But, just as clearly, those charged with overseeing the day-to-day interchange between teacher and student must exercise that degree of restraint neces-

15. In Burnside v. Byars, the Fifth Circuit ordered that school authorities be enjoined from enforcing a regulation against wearing freedom buttons when there was no evidence of disruption. The same panel of the Fifth Circuit on the same day in *Issaquena* upheld a similar regulation in another school because students wearing the buttons had attempted to force unwilling students to wear the buttons. When the offending students were ordered to remove their buttons and cease distributing them in school, they engaged in disruptive activities.

16. Even in this area there are constitutional limitations. In *Epperson*, for example, the Court held that a state could not prevent a high school biology teacher from teaching students about Darwin's theory of evolution because the regulation would be an establishment of religion in violation of the first amendment. Nor can a state prevent the teaching of modern foreign languages under the guise of promoting "civic development." Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

sary to protect first amendment rights. The question we must ask in every first amendment case is whether the regulatory policy is drawn as narrowly as possible to achieve the social interests that justify it, or whether it exceeds permissible bounds by unduly restricting protected speech to an extent "greater than is essential to the furtherance of" those interests. *See* United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Thus, when a teacher presents a colorable claim that school authorities have infringed on his first amendment rights and arbitrarily transgressed on these transcendent values, school authorities must demonstrate a reasonable basis for concluding that the teacher's conduct threatens to impair their legitimate interests in regulating the school curriculum. What we require, then, is only that rules formulated by school officials be reasonably related to the needs of the educational process and that any disciplinary action taken pursuant to those rules have a basis in fact.

 Several factors present here compel the conclusion that the Board of Education arbitrarily and unjustifiably discharged James for wearing the black armband.[17] Clearly, there was no attempt by James to proselytize his students.[18] It does not appear from the record that any student believed the armband to be anything more than a benign symbolic expression of the teacher's personal views. Moreover, we cannot ignore the fact that James was teaching 11th grade (high school) English. His students were approximately 16 or 17 years of age, thus more mature than those junior high school students in *Tinker*.

Recently, this country enfranchised 18-year-olds.[19] It would be foolhardy to shield our children from political debate and issues until the eve of their first venture into the voting booth. Schools must play a central role in preparing their students to think and analyze and to recognize the demagogue. Under the circumstances present here, there was a greater danger that the school, by power of example, would appear to the students to be sanctioning the very "pall of orthodoxy," condemned in *Keyishian*, which chokes freedom of dissent.[20]

Finally, James was first removed from class while he was teaching poetry. There is no suggestion whatsoever that his armband interfered with his teach-

17. In light of our holding, we find it unnecessary to decide whether the Board of Education violated James's due process rights by not affording him an evidentiary hearing before he was dismissed. *Compare* Roth v. Board of Regents, 446 F.2d 806 (7th Cir.), cert. granted, 404 U.S. 909, 92 S.Ct. 227, 30 L.Ed.2d 181 (1971), and Sindermann v. Perry, 430 F.2d 939 (5th Cir. 1970), cert. granted, 403 U.S. 917, 91 S.Ct. 2226, 29 L.Ed.2d 694 (1971) (a probationary teacher has a right to a hearing when he has a colorable claim that his dismissal violates the first amendment), *with* Parker v. Board of Education, 348 F.2d 464 (4th Cir. 1965) (a probationary teacher has no constitutional right to a hearing when his contract is not renewed). *See also* Drown v. Portsmouth School District, 435 F.2d 1182, 1188 (1st Cir. 1970), cert. denied, 402 U.S. 972, 91 S.Ct. 1659, 29 L.Ed.2d 137 (1971) ; Orr v. Trinter, 444 F.2d 128, 135 (6th Cir. 1971), petition for cert. filed, 40 U.S.L.W. 3126 (Aug. 18, 1971) ; Shirck v. Thomas, 447 F.2d 1025, 1026 (7th Cir. 1971), petition for cert. filed, 40 U.S.L.W. 3321 (Dec. 3, 1971), 40 U.S.L.W. 3375 (Jan. 21, 1972) ; Note, 85 Harv.L.Rev. 1327 (1972). The Supreme Court has heard argument in both *Roth* and *Sindermann*, and its decision may well be dispositive of this issue.

18. Appellees argue that James's political activity was unacceptable in the classroom because the armband was "the projection of an idea . . . it asks no comments in return and it invites no discussion." This fact alone cannot condemn a protected medium of expression.

19. Eighteen-year-olds, in addition, are now eligible to serve on federal juries. Pub. L. No. 92–269 (Apr. 6, 1972).

20. *See* Hanover v. Northrup, 325 F.Supp. 170 (D.Conn.1970) (violation of first amendment rights to dismiss a junior high school teacher who refused to lead her class in the Salute to the Flag because she believed the phrase "with liberty and justice for all" was an untrue statement).

ing functions, or, for that matter, that his teaching ever had been deficient in any respect.[21]

## IV.

We emphasize that we do not question the broad discretion of local school authorities in setting classroom standards, nor do we question their expertise in evaluating the effects of classroom conduct in light of the special characteristics of the school environment. The federal courts, however, cannot allow unfettered discretion to violate fundamental constitutional rights.[22] Professor Jaffe put it aptly in an analogous area of the federal courts' review power: ". . . expertness is not a magic wand which can be indiscriminately waved over the corpus of an agency's findings to preserve them from review." L. Jaffe, Judicial Control of Administrative Action 613 (1965). We cannot abdicate our responsibility to form our own conclusions when, having thoroughly searched the record, we find no sound constitutional basis for the Board's or the Commissioner's conclusions.

The dangers of unrestrained discretion are readily apparent. Under the guise of beneficent concern for the welfare of school children, school authorities, albeit unwittingly, might permit prejudices of the community to prevail. It is in such a situation that the will of the transient majority can prove devastating to freedom of expression. Indeed, James has alleged in his complaint that another teacher, "without incurring any disciplinary sanction, prominently displayed the slogan 'Peace with Honor' on a bulletin board in his classroom." This slogan has been associated with our foreign policy. If the allegation is true, and we must assume that it is in light of the summary dismissal of the complaint, it exemplifies the concern we have expressed. The Board's actions under such circumstances would indicate that its regulation against political activity in the classroom may be no more than the fulcrum to censor only that expression with which it disagrees. See Tinker v. Des Moines Independent Community School District, 393 U.S. at 510–511, 89 S.Ct. 733, 21 L.Ed.2d 731 (petitioners were barred from wearing black armbands, but other students were allowed to wear political campaign buttons and the Iron Cross, a traditional symbol of Nazism). By requiring the Board of Education to justify its actions when there is a colorable claim of deprivation of first amendment rights, we establish a prophylactic procedure that automatically tempers abuse of properly vested discretion.

It is characteristic of resolutions of first amendment cases, where the price of freedom of expression is so high and the horizons of conflict between countervailing interests seemingly infinite, that they do not yield simplistic formulas or handy scales for weighing competing values. "The best one can hope for is to discern lines of analysis and advance formulations sufficient to bridge past decisions with new facts. One must be satisfied with such present solutions and cannot expect a clear view of the

---

21. Appellees rely extensively on Goldwasser v. Brown, *supra*, which is clearly inapposite. Goldwasser, a civilian, was employed as a language instructor in the Air Force Language School to teach English to foreign military officers. After repeated warnings against discussing controversial subjects during class hours, he was discharged for antiwar statements and comments about anti-Semitism in America. In upholding the dismissal in the face of a first amendment challenge, the court relied on findings that his conduct interfered with the proper performance of his duties because he unduly

sacrificed classroom teaching hours. 417 F.2d at 1176–1177.

22. The Supreme Court decision in *Tinker* instructs that the federal courts must not accept unquestioningly the school authorities' judgment as to the effects of classroom conduct or speech. *See*, Note, The Supreme Court, 1968 Term, 83 Harv. L.Rev. 7, 158 (1969): "By not deferring to the administrative expertise of school officials, *Tinker* imposes new limitations on the power of the state to restrain students from speech or conduct which would clearly be protected by the first amendment if engaged in by adults."

terrain beyond the periphery of the immediate case." Eisner v. Stamford Board of Education, 440 F.2d 803, 804 n. 1 (2d Cir. 1971).

It is appropriate, however, lest our decision today (which is based on the total absence of any facts justifying the Board of Education's actions) be misunderstood, that we disclaim any intent to condone partisan political activities in the public schools which reasonably may be expected to interfere with the educational process.

Accordingly, we conclude that the district court erred. The judgment of the district court is reversed and the case remanded for proceedings not inconsistent with this opinion.