Charles JAMES, Plaintiff,

v.

The **BOARD OF EDUCATION OF CENTRAL DISTRICT NO. 1 OF the TOWNS OF ADDISON, ET AL., STEUBEN COUNTY, NEW YORK, et al.,** Defendants.

No. Civ. 1971–164.

United States District Court,
W. D. New York.

Nov. 19, 1974.

Burt Neuborne, American Civil Liberties Union, New York City, for plaintiff.

Harry Treinin, Corning, N. Y., for defendants.

CURTIN, Chief Judge.

The plaintiff, a probationary teacher of eleventh grade English at Addison Central High School, was suspended for wearing a black armband to school on November 14, 1969, a Vietnam Moratorium Day. He returned to his teaching duties a few days later, but was again suspended when he wore a black armband to school on another Vietnam Moratorium Day, December 12, 1969. He was dismissed on January 13, 1970 and, on September 23, 1970, the New York State Commissioner of Education upheld James' dismissal.[1] On April 14, 1971 the plaintiff filed a civil rights action pursuant to 42 U.S.C. § 1983 in this district. The defendants moved on September 13, 1971 for a dismissal of the complaint and for summary judgment before the Honorable Harold P. Burke. By order of December 23, 1971, Judge Burke denied the plaintiff's motion for summary judgment and granted defendants' motion for dismissal of the complaint. Following appeal to the United States Court of Appeals for the Second Circuit, this action of the district

court was reversed on May 24, 1972, 461 F.2d 566 (2d Cir. 1972), and the "case remanded for proceedings not inconsistent with this opinion." On August 12, 1972, while Judge Burke was on vacation, the parties appeared before me on plaintiff's application for a preliminary injunction reinstating the plaintiff to his teaching position for the school year 1972–1973. As the defendants had not obtained a stay of the order of the Second Circuit, I directed them to reinstate Mr. James. The Supreme Court denied defendants' petition for a writ of certiorari on December 4, 1972 and the action was then returned to the district court, where it was assigned to the late Judge John O. Henderson's calendar on October 29, 1973. Shortly thereafter the plaintiff renewed his motion for summary judgment, which was pending upon Judge Henderson's calendar at the time of his death in February 1974.

In the Second Circuit decision of May 24, 1972, Judge Kaufman framed the issue in this case as follows:

. . . whether, in assuming the role of judge and disciplinarian, a Board of Education may forbid a teacher to express a political opinion, however benign or noncoercive the manner of expression. We are asked to decide whether a Board of Education, without transgressing the first amendment, may discharge an 11th grade English teacher who did no more than wear a black armband in class in symbolic protest against the Vietnam War, although it is agreed that the armband did not disrupt classroom activities, and as far as we know did not have any influence on any students and did not engender protest from any student, teacher or parent. We hold that the Board may not take such action.

461 F.2d at 568.

When the parties appeared before me on plaintiff's motion for summary judg-

---

1. For a discussion of Commissioner Nyquist's decision, see the Second Circuit opinion 461 F. 2d 566, 570, n. 7 and accompanying text.

ment, the defendants urged that the wearing of the armband by Mr. James caused disruption in the school and that they have an opportunity to prove it. For that reason the court set this case for trial, which was held on July 9 to 11, 1974. Following trial both parties submitted briefs on the law and facts which the court has considered carefully. The following constitutes the court's findings of fact and conclusions of law.

Many of the facts in this case are undisputed by the parties. None of the essential facts which Judge Kaufman gleaned from the papers submitted on the motions was contradicted by the evidence at trial. However, for completeness, the facts revealed at the trial before the court are set forth here.

In 1969 Charles James was employed as an eleventh grade English teacher at Addison High School, a public educational institution located near Elmira, New York. At that time the school was composed of about 1900 students and 100 teachers. Central District No. 1 is primarily a rural school district with students coming from a number of surrounding towns. The Board of Education of the Central School District No. 1, of the Towns of Addison, et al., has control of public education in the Addison School District. In 1969 Robert Andrews, named as a defendant, was President of the Board of Trustees of Central District No. 1. Other members

of the Board of Trustees in 1969 were Ralph Vena, Edward Linsler, Walter Mergler, Henry Gettstine, Charles Champlain and Thomas Lyons. Defendant Carl Pillard is, and in 1969 was, the Principal of Addison High School and was responsible for the day-to-day operation of the school. Defendant Edward J. Brown is, and in 1969 was, the District Principal of Central District No. 1 and was the chief executive officer of its school system.

Before teaching at the Addison school, Mr. James had previously taught English at Bainbridge High School in Bainbridge, New York for four years, and at Arturo Toscanini Junior High School in the South Bronx for two years. Prior to teaching English, Mr. James had served as a Methodist minister from 1955 to 1963. Shortly after he ended his affiliation with the Methodist ministry in 1963, he began to attend the Quaker Meetings in the Philadelphia area where he was enrolled at Temple University. In 1967 when he was teaching in the New York area, he often attended the Friends' Meetings in Flushing. He continued his involvement with the Quakers when he moved upstate to Addison and attended the Elmira Meetings on a regular basis.[2]

### THE NOVEMBER 14, 1969 ARMBAND INCIDENT

In September 1969 when James began to teach English to eleventh graders, he

---

2. Because James' religious convictions play an important role in the resolution of this lawsuit, the court shall consider in some detail James' religious affiliations. He characterized his association with the Friends in Flushing as a regular attender. He explained to the court that he was never a member of the Flushing Meeting; that the Flushing Meeting was a very prestigious Meeting "and it wasn't the kind of place I would even thought about asking for membership until I had been there many years." (Tr. at 32.) James further testified that in most Friends Meetings there are more attenders than there are members. *Id.* In 1969 when the James family came upstate, they attended the Elmira Meeting on a regular basis. Subsequent to the armband incident, James became a member of the Elmira Meeting. (Tr. at 33.) This was in his second

or third year of attendance. (Tr. at 101.) The context of James' armband decision is important because the court rejects defendants' implication that it was not an individual decision. Defendants propose that the court find that "[p]laintiff allied himself with those who felt the war was wrong." The court rejects such a finding as it is not based on the testimony. As James carefully pointed out, "[t]he original roots of [Quakerism's founder's] conscience were those of nonviolence. This isn't the root of any other American religious group." (Tr. at 106.) Mrs. Dee, an attender at the Elmira Meeting in 1969 (subsequently a member) buttressed James' testimony concerning his religious motivations. "We all were wearing armbands, we all were doing everything that we could to make a peaceable statement of our deep concern." (Tr. at 151.)

was assigned the normal teaching load of five classes. Prior to November 14, 1969 no one complained about his teaching ability. November 14, 1969 was observed as a Moratorium Day in protest over the Vietnam War. As that day approached, the Quaker Meeting in Elmira discussed means of observing it in a proper manner. They decided that one project to be undertaken was to make armbands and to distribute them among members of the Meeting. Two to two and a half-inch wide, black armbands were placed on a table at the Quaker Meeting House for those who wanted to take them.

James wore one of these armbands on the left arm of his sport coat when he arrived at 8:00 a. m. at the Addison High School for teaching on November 14, 1969. At about 8:10 a. m. Carl Pillard, the principal of the school, entered James' homeroom, appeared to notice James' armband, but did not mention it and advised James to ignore any students who might wear black armbands on that day. From 8:30 a. m. until 8:45 a. m., Mr. James conducted a homeroom session, at which nothing unusual occurred. Following the homeroom, he had a free period from 8:45 a. m. to 9:30 a. m., during which time he saw no students. At the second period, beginning at 9:30 a. m., James taught a poetry lesson to an eleventh grade non-regents English class and again there was no unusual behavior or incident.[3] In fact, during the entire course of the events of November 14, no student or faculty member complained to James or even mentioned the armband. He conducted his normal teaching routine and did not discuss the armband with any of the students in class. Midway through the second period, Mr. Pillard called James

on the telephone, asking him to report to his office. When James arrived there, Pillard asked him why he was wearing the armband. James responded: "Because I am against killing." Pillard then told James that he considered the armband a political act against the President of the United States and asked James to take it off. When Pillard refused James' request for time to think over removing the armband, James said he would leave it on. Pillard did not express any fear of physical disruption in the school, but did express anxiety over "getting calls from all the parents by noon." Pillard then sent James to the office of the District Principal, Edward J. Brown, who also asked James why he was wearing the armband. James told Brown that it was to demonstrate his opposition to killing and explained to him the Quaker Meeting and the background of his wearing the armband. Brown told James that he felt that the wearing of the armband had political connotations and that it was "contrary to the teachers' code of ethics, felt that it would be disruptive to the education process, and it might lead to further disruption and divisiveness among the teachers." Tr. at 207.[4]

When they could not reach an agreement about the armband, Brown suspended James pending Brown's seeking legal counsel and advice of the Board of Education. At trial Brown testified that he conceded that no physical disruption was caused by the armband wearing. He testified: "I would say that the discipline of the school was normal on that occasion." Tr. at 233. He received no student or parent complaints and knew of no interruption in the ordinary classroom day. At trial, however, Brown testified that in his opinion sound educational practice was

---

3. The students were participating in class. When James was called to go to Mr. Pillard's office the class was orderly and, when James subsequently was asked to go to Mr. Brown's office, he checked his class and found them quiet and well-behaved.

4. Defendants have asked the court to find that "[d]isputes over the wisdom of the war

disrupted and divided the country. It was a period of great trauma and tension." The court refuses to so find. What is relevant to this lawsuit is whether there was an atmosphere of tension or disruption during this period *at the Addison High School*. There has been no testimony in support of a finding of either at Addison.

violated by James wearing the armband because all known sides of controversial issues should be presented to students, while wearing of the armband gave only one point of view.[5] Brown also felt that the armband was out of place in an English class but, under proper guidance, might be used as a class illustration in a social studies class. After his conversation with Brown, James conducted his class to the cafeteria and left the building for home. On his way home, James stopped to see a Methodist minister friend and then went to the Quaker Meeting House in Elmira where he participated in an ongoing prayer vigil.

On November 15, 1969 the Board of Education met to consider James' conduct, without notifying him of the meeting or giving him an opportunity to explain his position.[6] On the same day the Board sent James a letter confirming his suspension on November 14 for a "political act" and allowing him to return to class on November 17, 1969.[7] James returned to his teaching assignment on the 17th and continued teaching without incident until December 12, 1969.[8]

## THE DECEMBER 12, 1969 ARMBAND INCIDENT

Because James did not consider the armband wearing a political act, when other members of the Quaker Meeting decided to wear black armbands on the December 12, 1969 Moratorium Day James did also. On the 12th, shortly after James arrived in his homeroom, Pillard came in and told him to report to Brown's office. At this time there were no students in the school, but Brown immediately suspended James and he left the building.[9] James requested a hearing before the Board of Education. He was told that he could address the Board but would not be afforded a formal hearing. He decided not to attend the meeting of the Board which was held on January 13, 1970. The Board proceeded to discharge him from his teaching position in accordance with Section 3013(1) of the Education Law of New York, McKinney's Consol.Laws, c. 16.

In support of their position that the wearing of the armband was a disruptive act, the defendants called Edward Brown, the District Principal of the School System, Dr. Anthony Terino,

5. If Brown had asked James to inform the class that wearing the armband was strictly personal and that the class was free to disagree with it if they desired, James testified he gladly would have done so.

6. The memorandum of Brown's November 14 conversation with James, provided to the Board, did not mention any of the Quaker motivations underlying James' decision to wear the armband.

7. The letter in full read:
   The Board of Education of Addison School District has conferred with counsel and very thoroughly discussed the facts of your situation. The Board has, unanimously, confirmed the action of District Principal Edward J. Brown regarding your suspension on Friday, November 14, 1969.
   The Board deems your action to be a political act. As such, it is prohibited in the School. It is, also, deemed unethical action on the part of a teacher to engage in such activity.
   You may return to class on Monday, November 17, 1969, with the understanding

that you engage in no political activities while in the School.
   Of course, the Board recognizes fully your absolute right to express outside of the School any beliefs that you may have.

8. In James' view, his wearing the armband on November 14 did not in any way affect his ability to carry out his teaching duties on November 17. In fact, James testified that he taught without incident until December 12, 1969:
   Q. In the period of November 17th through December 12th, did you receive any complaint from any student or teacher concerning your having worn the armband?
   A. No.
   '(Tr. at 58.)

9. Defendants attempt to argue that the Second Armband Incident would be more disruptive than the first because of the widespread publicity the First Incident received. That argument is unacceptable under these facts. On December 12, 1969 James saw no students.

Educational Advisor for the State Association of School Principals, and Dr. Thomas Sheldon, Deputy Commissioner for Elementary, Secondary, and Continuing Education in New York State. Neither Dr. Terino nor Dr. Sheldon had visited the school or talked with any students or teachers. Neither knew if other students or teachers had commented on the armband or had seen it. They derived their information about the incident from the papers filed in the case, the proceedings before the Commissioner of Education, and from discussions with counsel about the facts.

In his testimony Principal Edward Brown stated that he believed the act had political connotations regardless of James' motivation. Brown felt that the wearing of the armband was disruptive to the education process and might lead to further disruption among the teachers. No facts were elicited from him to support these opinions. In Brown's opinion, wearing the armband violated the code of ethics because, by doing so, James presented only one point of view on the war to the students. Dr. Terino agreed with Mr. Brown that the wearing of the armband was a form of protest against the war, and that the wearing of the armband presented only one side of an issue. Terino explained that the impact of the armband could not be measured because the reaction is an "internal" one. "The fact that there are no physical protests does not make the wearing of any device that shows one side of a controversial issue, does not justify the use of that device." Tr. at 299. If Dr. Terino were the principal, he would have handled the problem in a different fashion. He would have told James: "If you insist on wearing your armband please take a day's leave of absence and wear it outside the building." Tr. at 314. Although he recognized the fact that teachers throughout the state daily expressed opinions for

or against the war policy of the Administration, the wearing of the armband took on special significance in his mind. He stated that it would have a greater impact upon students than the spoken word. He would approve a classroom activity in which the teacher gave his point of view and the students responded, as opposed to wearing the armband without discussion which prevented the students from presenting their viewpoint. He reacted in a different way to slogans; he testified: "A quotation of Peace With Honor doesn't conjure up in my mind as clearly as does the armband one side of a controversial issue." Tr. at 370. In Terino's opinion, if a teacher by outside activities became so well known in the community to become himself a symbol of opposition to war, he could continue to teach in the school as long as he did not express his views there. He then put forth the unremarkable idea that the period of 1969 was one of controversy in America and that physical and other types of disruption had to be prevented in the classroom. He said that the teacher had no right to prevail upon students with his own personal viewpoint without giving students exposure to other sides of the issue and the opportunity to ask questions. Dealing with the armband, he related that any symbol must be viewed within the context of the particular situation,[10] for example:

> The cross, which is ordinarily revered in the Christian community, has been a sign of fear historically in a number of occasions. It [also] became a sign of hope.

Tr. at 407.

In his view, the armband James wore symbolized protest of the Vietnam War.

> It started with massive mourning for those who died in the war, but it also meant opposition to the war. It was a political symbol, in my opinion.

Tr. at 408.

---

10. It is interesting to note that Dr. Sheldon did not perceive the wearing of dashikis and other black garb as a symbol to black students.

Sheldon characterized the armband wearing as "poor pedagogy" because it presented the viewpoint of the wearer, but did not give students an opportunity to respond. He would allow the armband wearer to instigate discussion as long as both sides of the issue were presented and would not oppose the act if James had made some attempt to notify the students why he was wearing the armband and given them an opportunity to disagree,[11] but he did not know whether James had done this or whether he had been given an opportunity to do it.[12] He said that if someone who usually did not wear any symbol wore a flag on Moratorium Day, he would find nothing objectionable to that.

## MR. JAMES' CONDUCT IN LIGHT OF THE FIRST AMENDMENT

■ The wearing of a black armband has been held to be a primary first amendment right akin to "pure speech." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In *Tinker*, the Supreme Court held that a school cannot bar or penalize *students'* constitutionally protected right to wear an armband absent "a showing that the students' activities would materially and substantially disrupt the work and discipline of the school." 393 U.S. at 513, 89 S.Ct. at 740.

■ With respect to a teacher's wearing of an armband, the Second Circuit has stated:

Any limitation on the exercise of constitutional rights can be justified only by a conclusion, based upon reasonable inferences flowing from concrete facts and not abstractions, that the interests of discipline or sound education are *materially and substantially*

jeopardized, whether the danger stems initially from the conduct of students or teachers. Although it is not unreasonable to assume that the views of a teacher occupying a position of authority may carry more influence with a student than would those of students *inter sese,* that assumption merely weighs upon the inferences which may be drawn. It does not relieve the school of the necessity to show a reasonable basis for its regulatory policies.

James v. Board of Education of Central Dist. No. 1 et al., 461 F.2d 566, 571 (2d Cir. 1972) (emphasis supplied).

In this case, the defendants have fallen far short of their burden of proving that the interest of discipline or sound education was materially and substantially jeopardized by the events described. At his initial meetings with Mr. James, Mr. Brown was not concerned with disruption in the school, but with receiving phone calls from irate parents. Although defendants' witnesses alluded to disruption, it is apparent that the classroom activity at the Addison High School continued at a serene pace throughout these Moratorium Days and that there was neither actual disruption nor the slightest threat of it. At best any threat of disruption was ephemeral and, in the words of Dr. Terino, "an internal one." The force of the testimony of defendants' witnesses is considerably diluted by their preoccupation with the armband, while refusing to recognize the impact of other symbols. While recognizing that a number of teachers were probably wearing symbols in support of the Administration they nonetheless chose to single out James' act as a violation of the code of ethics. In determining whether the code was violated, however, no attempt

---

11. Sheldon would have no trouble with James' act if he had said, "I'm a Quaker, this is an armband that was made at our Quaker meeting, I wear it as a symbol of Quaker aversion to the loss of life and mourning for death," and then allowed discussion. Tr. at 442.

12. It is clear from the facts that James did not have such an opportunity. *See, e. g.,* n. 5 *supra,* and accompanying text.

was made to interview any students or other teachers.[13]

■ It is not the characterization of an act protected by the first amendment, but its effect on the school environment, which allows the traditionally broad discretion vested in school authorities to evaluate teacher conduct "in light of special characteristics of the school environment." James v. Board of Education, *supra;* Russo v. Central School District No. 1, Towns of Rush, etc., N. Y., 469 F.2d 623 (2d Cir. 1972). In fact, on the basis of the record this court would be inclined to characterize James' acts as religious, were such a characterization necessary to the resolution of this case.

■ Nevertheless, what is essential for the defendants to carry their burden of proof is some sort of showing of actual educational or disciplinary disruption. The defendants have not offered any such proof. Testimony about some vague internal disruptions or alleged acts of "poor pedagogy" will not suffice. "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Tinker v. Des Moines School District, *supra,* 393 U.S. at 508, 89 S.Ct. at 737, 21 L.

Ed.2d 731. Furthermore, it is evident that only symbols expressing one side of the war issue were deemed to be a prohibited political act.[14] "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L. Ed. 1628 (1943). *See also* Russo v. Central School District No. 1, *supra.* Since there is no showing that either "the rules formulated by school officials [are] reasonably related to the needs of the educational process [or] that  .  .  . disciplinary action taken pursuant to these rules have a basis in fact," James v. Board of Education, *supra,* 461 F.2d at 574, plaintiff's motion for summary judgment must be granted.

## DAMAGES

■ Since the Board's action in dismissing Mr. James was constitutionally impermissible, Mr. James is entitled to compensatory damages in the nature of back pay. *See, e. g.,* Connell v. Higginbotham, 305 F.Supp. 445 (D.C.Fla. 1969); aff'd in part, rev'd in part on

13. Furthermore, there was substantial evidence in the case that the opinion of defendants' experts did not coincide with the viewpoint of other well regarded educators. Dr. Kenneth B. Clark, president of the Metropolitan Applied Research Center, Distinguished Professor of Psychology at the City College of the City University of New York, and member of the New York State Board of Regents deposed testimony was offered by plaintiff. Dr. Clark testified that, in the absence of evidence that a symbol is used by the authority-figure teacher to intimidate or psychologically coerce a student, he had no objection to the symbol on either educational or psychological grounds. "Not only would I not have any objection, but I would think that this is within the rights of the human being." Clark Deposition at 12. Dr. Clark also discussed the armband as a symbol in relation to other symbols. He stated that the armband was no more inherently disruptive "than the fact of a teacher wearing

an American flag in the lapel  .  .  . , or a teacher wearing a cross on a chain, or a teacher wearing a cross of David on a chain." Dr. Clark characterized all of these as "symbols of an individual's concern." *Id.* at 10.

Charles E. Davis, Superintendent of the Elmira City Schools, intimated that he did not concur in the views of his Addison colleagues in his letter to the suspended Mr. James regarding employment.

> I have followed your problem situation with considerable concern and admit to being shocked by the Commissioner's ruling. Of course, I am not a lawyer, but frankly I had expected a different approach in the ruling.

Plaintiff's Exhibit 11.

14. See discussion of Dr. Terino's testimony on "Peace With Honor" signs and Dr. Sheldon's comments on flag lapel pins, *supra.*

other grds., 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1970). The amount of back pay due to Mr. James is computed as follows: James' salary for the remainder of 1970 would have been $4,504.50, for 1970–71 $10,780.00, and for 1971–72 $11,520.00.[15] This totals $26,804.50. The total of $5,840.25 was earned by James in mitigation.[16] The amount due James is thus $20,964.25.

The court also holds that this is a proper case for the awarding of costs and attorneys' fees. In Stolberg v. Members of Bd. of Tr. for State Col. of Conn., 474 F.2d 485 (2d Cir. 1973), the plaintiff's teaching contract was not renewed following his mailing fellow faculty members an invitation to participate in a Peace Program concerning the Vietnam War. Judge Mansfield wrote for the Second Circuit:

The circumstances of this case persuade us that an award of counsel fees is necessary to protect against the possibility that other faculty members might be reluctant to engage in activities protected by the First Amendment or might forgo the vindication of their rights to do so in a court of law. Such a result would be destructive of the educational process in a free society. When, as here, the constitutional right is one of great importance and proof of an intentional and serious violation is clear and definite, enforcement should not be inhibited by reason of litigation costs.

474 F.2d at 490.

The Clerk is directed to enter judgment in the amount of $20,964.25 in favor of the plaintiff. Costs are to be paid by the defendants. The parties shall attempt to stipulate to reasonable attorney's fees to be paid by defendants. If the amount of attorney's fees cannot be stipulated to within sixty days, the plaintiff may apply, upon notice to the defendants, with a detailed statement of services, for the court to set a reasonable fee.

So ordered.

---

15. For 1970–71 and 1971–72 there is a dispute over which level of pay James is entitled to. For the M–3 level, a teacher has to show certification and a substantial degree of graduate work. "A Master's degree, which apparently qualified him for permanent certification in New York State, certainly would be acceptable." Tr. at 265. Mr. James has a Master's Degree in Education from Elmira College. The only requirement he did not fulfill for this so-called "horizontal transfer" is filing the declaration of intent. However, in those years Mr. James was not in school to make those applications. Therefore, the court finds that he is entitled to the M–3 level of pay for the years in question.

16. Amounts earned in mitigation have been computed by totaling income James earned from January, 1970 to August, 1972 during the regular school year and considering only daytime employment.

*Earnings Applied in Mitigation*

| | |
|---|---:|
| 1. Substitute teacher, Horseheads Central School—11/3/70; 11/12/70; 12/8/70 | $ 75.00 |
| 2. English class, Corning Community College 1/70–5/70 | 660.00 |
| 3. Substitute teaching, Elmira School District—12/70 (3 days) | 84.00 |
| 4. Part-time laborer, Werner-Salle 1/70–6/70 (¾ during school) | 1,391.25 |
| 5. Part-time English teacher, Ithaca College 1/71–5/71 | 3,000.00 |
| 6. Substitute teacher, Horseheads Central School 5/28/71; 6/10/71 | 60.00 |
| 7. Substitute teacher, Horseheads Central School 3/6–3/16/72; 3/20–3/23/72; 4/27/72; 4/28/72; 6/6/72 | 570.00 |