## Philip H. BURNS

v.

## Robert ROVALDI et al.

## Civ. No. H–76–19.

United States District Court,
D. Connecticut.

Feb. 27, 1979.

On the Merits Aug. 28, 1979.

---

Eugene N. Sosnoff, Sosnoff, Cooper & Whitney, New Haven, Conn., for plaintiff.

William R. Connon, Thomas N. Sullivan, Sullivan, Lettick & Schoen, Hartford, Conn., for defendants.

BLUMENFELD, District Judge.

The plaintiff Philip Burns was a tenured fifth grade teacher in the Plainfield school system until December 17, 1975, when his employment contract was terminated by a vote of the Plainfield Board of Education (the Board). Prior to the action of the Board, he was given specifications of the charges on which the termination was to be considered and a full public hearing before a quorum of the Board. He was represented at that hearing by himself and by his brother as counsel. Instead of taking an appeal to the Court of Common Pleas for review of the Board's decision, as provided for by Conn. Gen. Stat. § 10–151(f), he brought this action for a declaratory judgment, preliminary and permanent injunction, compensatory and punitive damages, and other equitable relief.

Plaintiff Burns alleges that the Board's termination of his contract was impermissibly based on his exercise of his first amendment rights, and also that the Board's decision violated both procedural and substantive rights of due process guaranteed him by the fourteenth amendment. Upon those allegations he invokes the Civil Rights Act, 42 U.S.C. § 1983, and its jurisdictional counterpart, 28 U.S.C. § 1343(3), as the basis for jurisdiction in this court. The individual defendants, allegedly acting under color of state law, are sued in their official, as well as individual, capacities. *See Dunham v. Crosby,* 435 F.2d 1177, 1181 n. 3 (1st Cir. 1970). Thus, since the defendants allegedly deprived the plaintiff of his constitutional rights, the "two elements that are necessary for recovery" in an action based on 42 U.S.C. § 1983 are present. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144,

150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). The defendants, who are members of the school board, challenge jurisdiction over them on the ground that they were acting only as a Board of Education. Building on that premise, they further contend that a school board is not a "person" amenable to suit under 42 U.S.C. § 1983. While that contention once had some support, see *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court has recently held that its reasoning is not applicable to school boards. *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

This case now comes before the court on cross-motions for summary judgment. A motion for a preliminary injunction, previously filed by the plaintiff, was denied after a hearing in January of 1976. A hearing on the motions for summary judgment was held on November 13, 1978. It is to those motions I now turn.

### The First Amendment Issue

Although there were three separate charges lodged against the plaintiff in the termination hearing before the Board, the principal one was based on conduct in class which directly affected the students. The classroom conduct of the plaintiff which provoked the institution of charges against him first came to the attention of Albert Mizak, the Superintendent of Schools, through letters from parents of fifth graders in Burns' class who wanted Burns fired. This sudden flurry of correspondence to the school authorities from those parents was their response to what Mr. Burns had done as a teacher of their children.

### A. The Pen-Pal Incident

In September of 1975, the plaintiff assigned to his then fifth grade class at the Memorial School a penmanship lesson. As part of that lesson, the students could either practice cursive penmanship by writing the alphabet or write a letter to the plaintiff's then fiancee. As a result of that assignment, each student who wrote to the plaintiff's then fiancee received from her a letter in return. These return letters were directly sent to the plaintiff who, in the classroom, distributed them to his students. Each letter was addressed to a specific student and was enclosed in a sealed envelope.

Among other things, the aforesaid letters, written by the plaintiff's then fiancee and distributed to various students in the plaintiff's fifth grade class contained the following, or similar statements:

"I am a communist, in the Progressive Labor Party, just like Phil [Burns] is.[1] We are both working hard for the day when you kids and the rest of us working people kick out all the rich rotten bosses and then we can all run everything ourselves. That is what communism really means. Then we can all cooperate and have a good and happy life. My son Chris is learning to be a Communist too!"

Pl.'s Exh. C, Hearing on Motion for Preliminary Injunction (letter dated October 6, 1975 addressed "Dear Sherry," which was part of the record of the contract termination hearing of Philip Burns as well as part of the record of the Hearing on Plaintiff's Motion for Preliminary Injunction). See also other letters marked as Pl.'s Exh. K–1, Hearing on Motion for Preliminary Injunction.

It is not surprising that parents of some of the fifth graders who got those letters promptly reacted by calling for the discharge of the plaintiff as a teacher in communications to the Superintendent.

On October 17, 1975, the Superintendent (Mizak) called Burns into his office. When Burns answered "No" to Mizak's inquiry if he knew why he was there, Mizak said,

---

1. Even without identifying herself and Phil as communists, the rest of the letter was a simplified but explicit exposition of Marxist communism. It implied the abolition of private property, the abolition of classes, and with the end of "classes" the abolition of conflicts of inter-ests and the establishment of the unity of society. This entirely conforms to the Marxist doctrine which assumes that all the important social conflicts are rooted in class divisions, and it is the sectarian view of a number of persons united in opinion and interest.

"Well, I think you do. It's because of the [pen-pal] letters." Tr. at 8, Hearing on Motion for Preliminary Injunction, Jan. 26, 1976. He offered to let Mr. Burns resign and gave him a few days to think it over, and also told Burns that he was going to recommend to the school board that his contract to teach be terminated. By letter of October 28, 1975, Mizak wrote to Burns:

"In response to your request for a statement of the reasons for the proposed termination of your contract of employment, this is to notify you that the reasons are the following:

(1) insubordination. More specifically, you have violated a directive issued to all personnel by the Superintendent of Schools, and dated June 12, 1975, which is entitled 'Interruption of School Programs or Duties' in that, on at least on[e] occasion, you visited the classroom of a fellow teacher to discuss your personal affairs, thereby, interfering with that teacher in the performance of his duties.

(2) You have evidenced incompetence in the performance of your assigned teaching duties by using your classroom and your access to students in your classroom as a vehicle for the dissemination of your political convictions."

Pl.'s Exh. F, Hearing on Motion for Preliminary Injunction.

Thereafter, on November 19, 1975, Mizak again wrote to Burns about the letter-writing charge to which (2) above refers:

"The following is submitted in response to your request for a more specific statement of the charges which form the basis for the recommendation that your teaching contract with the Plainfield School System be terminated.

" . . .

"You have also been charged, as stated in the October 28, 1975 letter to you, with incompetence, 'in that you have used you[r] classroom as a vehicle for the dissemination of your political convictions.' More specifically, you are charged with having caused letters to be written by a personal friend to your fifth grade students. These letters were written in response to letters written by your students as part of an in-class assignment and delivered by your class to these students. The letters in question which can, at best, be described as politically dogmatic in nature, were distributed by you to your students even though you knew their political content. Their distribution by you is a violation of the spirit, if not the letter, of the by-laws of the Plainfield Board of Education which prohibits sectarian or partisan instruction. In addition, your distribution of these letters which indicate extreme bias on the part of the writer evidences, at the least, a lack of judgment on your part and a misunderstanding of your role as a teacher.

"Please be advised that pursuant to your request and that of your attorney, a date will be set for a hearing on the above matters before the Plainfield Board of Education no sooner than fifteen (15) days from your receipt of this more specific statement."

Pl.'s Exh. G, Hearing on Motion for Preliminary Injunction.

A third charge was added on December 1, 1975:

"The following constitutes an amendment to, and an addition to, the statements of charges dated November 19, 1975. You should be prepared to answer these charges, as well as previous charges, to which I will refer at the hearing to be held before the Plainfield Board of Education:

1. You are charged with insubordination based on the events of Wednesday, the 26th of November 1975, at Plainfield Memorial School when Mr. Bahner indicated that Ms. Kingsley was not to enter your room. Nevertheless, you allowed Ms. Kingsley to do so . . . . .

.    .    .    .    .

"In regard to the charges, reference should be made to the Board of Education By laws, Article 6, Section 606, and to an item in the daily bulletin from Mr.

Bahner distributed to the entire staff on November 24, 1975 and again on December 1, 1975."

Pl.'s Exh. H, Hearing on Motion for Preliminary Injunction (letter from Mizak to Burns, dated Dec. 1, 1975).

Finally, on December 10, 1975, Mizak again wrote to Burns:

"With regard to the charge of incompetence which is stated in my letter to you dated October 28, 1975, it has come to my attention from statements that you have made in the media that there may be some confusion in your mind about the nature of that charge.

"The basic facts of that charge form the essence of my claim that you have acted improperly in your classroom. It is clear that your actions in the classroom also support a charge of insubordination. To the extent that your actions indicate incompetence, I do not wish you to be misled to the extent that you feel that the charge is based on insufficient knowledge of the subject areas you teach. The charge of incompetence concerns itself not with your knowledge of the subject areas, but with your apparent inability to restrict your actions in the classroom to the subject areas you are assigned to teach. To the extent your classroom activities indicate a willful refusal to avoid the promulgation of sectarian political views to your students it is my judgment that your actions constitute insubordination. In this regard please make reference to the by-laws of the Plainfield Board of Education, sec 305, sub paragraph d.

"Should you have any questions in regard to this letter, which should be viewed as a clarification of the original charge of incompetence and as an additional charge of insubordination based on your conduct in the classroom, please do not fail to contact me."

Pl.'s Exh. J, Hearing on Motion for Preliminary Injunction. As the letter points out, the foundation for the principal charges against Burns is in the by-laws of the Plainfield Board of Education, specifically section 305(d):

"No sectarian or partisan instruction shall be allowed, and no book tract designed to advocate the tenets of any particular sect or party shall be permitted in any of the schools."

Pl.'s Exh. K–1, Hearing on Motion for Preliminary Injunction (also Administration Exh. 16, Termination Hearing of Philip Burns).

Through his counsel, the plaintiff admitted in open court at the hearing on this motion for summary judgment that he knew what the contents of the letters were before he handed them out to his students. Nor is it seriously argued that this "penpal" project should be regarded as an exercise in penmanship. (The letters of the children went to Burns' fiancee. Her answering letters did not concern penmanship.)

The Board found that the foregoing charges had been proved. Indeed, there is no dispute over any of the essential facts. The Board then concluded:

"It is the conclusion of the Board of Education of the Town of Plainfield that Mr. Philip Burns has been insubordinate and has evidenced incompetence in that he has violated the rules of the Board of Education pertinent to partisan instruction and the directives of the Superintendent of Schools with regard to interruption of school programs or duties. It is also the specific finding of the Board of Education that Mr. Burns defied its agents and his superiors, the Superintendent of Schools and the Principal of Plainfield Memorial School based upon the facts as listed above, notably the incidents of November 26, 1975, and that this defiance constitutes insubordination on his part."

Pl.'s Exh. M, Hearing on Motion for Preliminary Injunction.

The plaintiff does not seriously complain of any denial of procedural due process at any stage of the proceedings, nor is there

any basis for such a claim.[2] Nor does he deny complete responsibility for the distribution of the letters to his students. He does not contend that the contents of the letter were not sectarian or partisan.[3]

■ The issue is squarely presented: does the interest of the Board of Education in prohibiting sectarian or partisan instruction at the fifth grade level of its school system outweigh the plaintiff's interest in first amendment protection. "Where there is tension between the two, accommodation must be sought in the balancing process which not infrequently characterizes the task of constitutional interpretation." *Goldwasser v. Brown*, 135 U.S.App.D.C. 222, 229, 417 F.2d 1169, 1176 (D.C.Cir. 1969), *cert. denied*, 397 U.S. 922, 90 S.Ct. 918, 25 L.Ed.2d 103 (1970). *See also Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968):

> "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

The first amendment's prohibition of any law "abridging the freedom of speech" is first among the freedoms safeguarded to the people. But this principle, like all of those in the law, is not absolute, and cannot always be perfectly sustained.[4] The plaintiff argues that academic freedom is inherent in the first amendment, and he defends his conduct as falling within the concept of academic freedom. On this ground, plaintiff moves for summary judgment on his behalf. The justification for this is that

"To preserve the 'marketplace of ideas' so essential to our system of democracy, we must be willing to assume the risk of argument and lawful disagreement." *James v. Board of Education*, 461 F.2d 566, 573 (2d Cir.), *cert. denied*, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972). Carried to its extreme limits, "academic freedom" permits a school teacher "to have his say on any and every thing about which he has feelings, provided there is no significant likelihood of impairment of his efficiency." *Goldwasser v. Brown, supra*, 417 F.2d at 1176, 135 U.S. App.D.C. at 229.

The rights of free speech, "while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. . . ." *Cox v. Louisiana*, 379 U.S. 536, 554, 559, 574, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). "The college classroom with its surrounding environs is peculiarly the 'market-place of ideas.'" *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972). There are some limitations on who may play the game of academic freedom. The view that "assumptions of the 'free marketplace of ideas' on which freedom of speech rests do not apply to school-aged children, especially in the classroom where the teacher may carry great authority," *Developments in the Law—Academic Freedom*, 81 Harv.L.Rev. 1045, 1053 (1968), has not been accepted without qualification. The view that *all* "school-aged children" were excluded from the academic freedom forum was qualified in *James v. Board of Education, supra*, 461 F.2d at 574, so as not to apply to 16- to 17-year-old juniors in a high school English class. *See also East Hartford Edu-*

---

**2.** The plaintiff had full and timely notice of the charges against him and the proposed action of the Board. He also had the opportunity to attend a public hearing, to be represented by counsel, and to be heard. *See Wood v. Goodman*, 381 F.Supp. 413, 420 (D.Mass.1974), *aff'd*, 516 F.2d 894 (1st Cir. 1975).

**3.** At the hearing before the members of the Board of Education, Mr. Burns stated not only that he knew of the general contents of the letters, but that he would have distributed them to his students in class even if he had known of

the exact language used in them. Tr. at 190, Contract Termination Hearing of Philip Burns, Dec. 16, 1975 (introduced as Pl.'s Exh. K, Hearing on Motion for Preliminary Injunction).

**4.** "It is a *non sequitur* to say that First Amendment rights may not be regulated because they hold a preferred position in the hierarchy of the constitutional guarantees of the incidents of freedom." *Poulos v. New Hampshire*, 345 U.S. 395, 405, 73 S.Ct. 760, 766, 97 L.Ed. 1105 (1953).

*cation Association v. Board of Education,* 562 F.2d 838, 843 (2d Cir.) (Oakes, J., for panel majority), *vacated en banc,* 562 F.2d 856 (2d Cir. 1977). As those cases suggest, both age and the extent of education of the students must be considered in determining whether the students have attained that degree of maturity which would enable them to evaluate the merits of communism versus capitalism. Even a most expansive concept of "a market-place of ideas" would not be extended to include a class of fifth graders among those with whom to discuss what is wrong with the world and how it can be put right. *See Mailloux v. Kiley,* 436 F.2d 565, 566 (1st Cir. 1971) (per curiam).

Despite the guarantee of a free trade in ideas, it has been authoritatively stated that "a State may permissibly determine that, at least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Ginsberg v. New York,* 390 U.S. 629, 649–50, 88 S.Ct. 1274, 1285–86, 20 L.Ed.2d 195 (1968) (Stewart, J., concurring). The plaintiff's contention that the contents of the pen-pal letters from his fiancee to his fifth grade students was permissible as within an exercise of academic freedom is a travesty on the concept of a "free trade in ideas." [5]

It is equally absurd to contend that a fifth grade schoolroom is a public forum traditionally devoted to speech and assembly. *Cf. Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *Grayned v. City of Rockford,* 408 U.S. 104, 119–21, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The *Pickering* balance must be struck without giving the plaintiff any benefit of a schoolroom locale or academic freedom label.

In striking the *Pickering* balance, the statements in the pen-pal letters distributed to the plaintiff's students have significance simply because of the character of their subject matter. The action of the Board was not taken on the basis that it had the power to regulate the content of materials distributed to the students because of its political, social, or philosophical message. The position taken by the Board, and expressed in its decision, is that Burns had introduced a controversial subject wholly unrelated to the subject matter being studied. "Mr. Philip Burns has been insubordinate and has evidenced incompetence in that he has violated the rules of the Board of Education pertinent to partisan instruction. . . ." Pl.'s Exh. M, Hearing on Motion for Preliminary Injunction (Conclusions of Board following Contract Termination Hearing). Burns was supposed to be teaching cursive penmanship by having the students practice writing the alphabet or writing letters. "It must be remembered that the primary function of the schools is the education of the community's children." *Connecticut State Federation of Teachers v. Board of Education Members,* 538 F.2d 471, 479 (2d Cir. 1976). It is the function of education in the primary grades to teach children first to know the tools of learning, and then how to use them. This is the first step to overcome illiteracy. By no stretch of the imagination could the pen-pal letters to the fifth graders from Phil's fiancee have any relevance to instruction in cursive penmanship. The by-law prohibiting sectarian or partisan instruction was aimed at maintaining the efficient use of time in school to teach subjects which were on the regular curriculum of the primary grades. As such, it was "reasonably related to the needs of the educational process" and not an impermissible infringement on a teacher's first amendment rights. *James v. Board of Education, supra,* 461 F.2d at 574. One court of appeals has noted, "we see no substitute for a case-by-case inquiry into whether the legitimate interests of the authorities are demonstrably sufficient to circumscribe a teacher's speech." *Mailloux v. Kiley, supra,* 448 F.2d at 1243. Considerably less vague, and surely more workable, is the standard of review set forth by the Second Circuit

---

5. From the dissenting opinion of Mr. Justice Holmes in *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919).

Court of Appeals in *James v. Board of Education, supra,* 461 F.2d at 574: "What we require, then, is only that rules formulated by school officials be reasonably related to the needs of the educational process and that any disciplinary action taken pursuant to those rules have a basis in fact."

Not only did the plaintiff not teach his students the subject he had been hired to teach in this pen-pal incident, he used the time which was provided for that purpose to do what was forbidden by submitting them to "sectarian or partisan instruction" contrary to the prohibition of the by-laws. *Cf. Janusaitis v. Middlebury Volunteer Fire Department,* 607 F.2d 17 at 25–26 (2d Cir. 1979) (applying *Pickering,* volunteer fireman's first amendment rights were not violated when he was fired for making statements in contravention of department regulations). The bald facts are that the plaintiff used the school time of the students to arbitrarily indoctrinate them in concepts having nothing whatever to do with skill or knowledge of penmanship. Only in bad faith can one refuse to recognize the difference between impartial and undogmatic *instruction* and *advocacy* of a partisan political doctrine together with the rejection of everything opposed to it. "[C]ertainly a teacher is not paid to go into school and teach subjects the State does not hire him to teach as part of its selected curriculum." *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 522, 89 S.Ct. 733, 744–45, 21 L.Ed.2d 731 (1969) (Black, J., dissenting). Burns introduced a controversial subject wholly unrelated to penmanship. His employment world was organized, and the students and the school board had a right to

have him instruct the children in penmanship. Requiring him to do that did not jeopardize his right to espouse his own views when he was not working as a teacher. But to say that he had personal freedom to impose his ideas upon the students during class time would grant the teacher control of curriculum and content. With that door open, any policies of a school board could be set aside at the will of a teacher. The first amendment does not go so far. "When a teacher is only content if he persuades his students that his values and only his values ought to be their values, then it is not unreasonable to expect the state to protect impressionable children from such dogmatism." *James v. Board of Education, supra,* 461 F.2d at 573. His job demanded some surrender of personal freedom to impose his ideas on his students. Invocation of the phrases "academic freedom" or "market-place of ideas" does not put upon the defendants the burden of justification for its by-laws.[6] "The question is whether or not there is a real abridgement of the rights of free speech." *Connecticut State Federation of Teachers v. Board of Education Members, supra,* 538 F.2d at 479.

The extent to which the plaintiff's rights were jeopardized does not outweigh the rights of the school board to require that he stick to his teaching responsibilities. The operation of public schools has been described as "perhaps the most important function of state and local governments." *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). "The very notion of public education implies substantial public control. Educational decisions must be made by someone; there is no reason to create a constitutional preference

---

**6.** "[S]chool boards must meet a burden of justification if they are to enforce a regulation which infringes on teachers' First Amendment rights. But the mere invocation of the words 'speech' and 'association' in a complaint does not put the boards to this test. Rather, before CFT can put the defendant school boards to this burden of justification, CFT must show that its members' First Amendment rights have in fact been infringed by the school boards' policies. The question is whether or not there is a real abridge-

ment of the rights of free speech. *Kovacs v. Cooper,* 336 U.S. 77, 85, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (plurality opinion). First Amendment claims must always be adjudicated in light of the special characteristics of the environment involved in the particular case. *Tinker, supra,* 393 U.S. at 506, 89 S.Ct. 733; *Healy v. James, supra,* 408 U.S. at 180, 92 S.Ct. 2338."
*Connecticut State Federation of Teachers v. Board of Educ. Members, supra,* 538 F.2d at 479.

for the views of teachers over those of their employers." *East Hartford Education Association v. Board of Education, supra*, 562 F.2d at 859. Insisting that he do his job as a teacher did not deprive the plaintiff of any first amendment rights. *See Goldwasser v. Brown, supra*, 135 U.S.App.D.C. at 230, 417 F.2d at 1177. On the basis of what has been considered above, there is ample support for the Board's determination that Burns' first amendment interests are not entitled to prevail in a *Pickering v. Board of Education* balancing against the policies of the school board.

## B. *Additional Grounds for Contract Termination*

▮ In addition to the conclusion that Burns had violated section 305(d) of the by-laws, the Board concluded that Burns was guilty of the two other charges which were considered at the hearing. The Board found that Burns was guilty of having interrupted a fellow teacher to discuss matters personal to him during her performance of her school duties, contrary to a specific memo to all teachers prohibiting such conduct. There was ample proof that such an incident had occurred prior to the "pen-pal letters" incidents.

The Board also concluded that the plaintiff wilfully violated a directive of his immediate superior, the school principal, by insisting that his fiancee, the pen-pal of incident number one, and her minor son, be permitted to be present in his classroom during an instruction period. His insistence provoked a confrontation between Burns and the principal which was resolved only by calling upon the police to enforce the order against visitors during classroom activities.

Each of these conclusions was amply supported by evidence. It is immaterial what standard of judicial review is applied to test the validity of these conclusions—whether that of " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' rather than the possible stricter standard of . . . 'unsupported by substantial evidence.' " *Cf. Automobile Club*

*of New York, Inc. v. Cox*, 592 F.2d 658, 664 (2d Cir. 1979). It is clear that under either test, the conclusions of the Board are supportable. Thus, permissible grounds existed for the Board's firing of the plaintiff. On the basis of the foregoing, the plaintiff's motion for summary judgment is denied.

### Other Protected Conduct

However, this does not mean that the *defendants'* motion for summary judgment must be granted, for the contention is made by Burns that his contract would not have been terminated on the basis of his violations of the rule against interference with a teacher and the order against allowing Ms. Kingsley into his fifth grade class if the Board had not also given weight to the "pen-pal" incident as a motivating factor in its decision. *See generally Davis v. Village Park II Realty Co.*, 578 F.2d 461, 464 (2d Cir. 1978). Burns argues that reliance on the pen-pal incident would be improper for two reasons. First, he argues that the pen-pal incident consisted of conduct constitutionally protected by the first amendment. That reason is invalid, as I have held above. Secondly, he contends that even if his conduct in the pen-pal incident taken by itself as a basis for contract termination was not constitutionally protected, the decision to terminate the contract nevertheless was motivated by *other conduct of Burns prior* to the pen-pal incident, which *was* constitutionally protected. Therefore, the argument continues, the decision based upon the pen-pal incident was itself so tainted as to infect all other grounds for termination with impermissible motivating factors. If that premise were established, it would be incumbent on the Board, according to the rule in *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), to show "by a preponderance of the evidence that it would have reached the same decision as to [Burns' discharge] even in the absence of the protected conduct." The "other conduct of Burns" is said to consist of Burns' openly avowed and activist membership in the Progressive Labor Party, the goals of

which include the violent overthrow of the capitalist system, expressed in part in the rhetoric included in the "pen-pal" letters. *See also Turner v. Air Transport Lodge*, 590 F.2d 409, 413–14 & n. 2 (2d Cir. 1978) (Mulligan, J., concurring). Thus, Burns contends that the Board must establish that it would have made the same decision without regard to anything he may have done in the past.

Before these defendants can be called upon to make that kind of a *Mt. Healthy* "same decision anyway" determination, the burden is on Burns "to show [not only] that his conduct was constitutionally protected, [but also] that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him." *Mt. Healthy, supra*, 429 U.S. at 287, 97 S.Ct. at 576; *see Givhan v. Western Line Consolidated School Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Waterbury Community Antenna, Inc., v. NLRB*, 587 F.2d 90, 99–100 (2d Cir. 1978); *Davis v. Village Park II Realty Co., supra*, 578 F.2d at 464. In effect, such a contention by Burns is in the nature of an affirmative defense. In *Mt. Healthy* it was clearly established that the school board considered constitutionally protected incidents not directly connected with Doyle's duties or role as a teacher—one of which was Doyle's telephone call to a radio station about a joint teacher-administration adoption of a dress code—which the board cited as a ground for not rehiring him. 429 U.S. at 282–83 & n.1, 97 S.Ct. 568.

In this case it is not clear whether the Board considered any conduct of Burns other than what was set forth in the formal charges against him. In the charges before the Board, Burns was only required to defend against the specified charges, not every particular action of his life. There is

nothing in the record to show that there was any evidence before the Board concerning prior conduct or statements of Burns in connection with his political activities. Apart from the notice of charges against Burns, it does not appear on the record that anything done or said by Mizak, other than the formal charges,[7] came to the attention of the Board members who heard and voted on the charges against Burns.

The hurdle which the plaintiff must clear before the defendants are put to the necessity of proving that they would have reached the same decision anyway consists of proof that other constitutionally protected conduct was "a 'motivating factor' in the Board's decision" to relieve him. 429 U.S. at 287, 97 S.Ct. at 576. The claim that Burns' prior conduct was a motivating factor in the Board's decision was not pleaded, and, as indicated above, it was not made an issue in the proceedings before the Board. That issue crept into the case during the course of a hearing on the plaintiff's application for a preliminary injunction. Even though it may be a technical flaw not to raise that issue by an amendment to the pleadings, some evidentiary matter relating to the issue had been introduced during the course of the hearing on the motion for preliminary injunction. While rules of procedure are important for assuring the wise exercise of the deliberative process, they ought not be thoughtlessly applied so as to foreclose decision on the merits.

At this stage of the proceedings, where defendants' motion for summary judgment is being considered, the court is not called upon to determine whether plaintiff has proven that his outside activities were a "motivating" factor in the Board's termination decision. For purposes of a summary judgment motion, the court does not try issues of fact but only determines whether there are issues to be tried. *E. g., United*

---

7. The Superintendent, Mizak, who prepared the charges against Burns was aware for years that Burns was a member of the Progressive Labor Party, and that he had been active in passing out posters and literature of the party. Despite that knowledge of Burns' beliefs and activities, which consisted of his political pronounce- ments in circulars and pamphlets that he sent around the community, Mizak had previously recommended Burns for tenure. Mizak had often told Burns that what he did out of school was his business, and within his rights as an individual. Tr. at 119–20, Hearing on Motion for Preliminary Injunction.

*States v. Bosurgi*, 530 F.2d 1105, 1110 (2d Cir. 1976); *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975). Furthermore, the party opposing a motion for summary judgment is to be given the benefit of all favorable inferences to be drawn from the moving papers. *See, e. g., Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

The question to be decided here, therefore, is whether, drawing all reasonable inferences in favor of the plaintiff, the plaintiff has established the existence of a genuine factual dispute as to whether the prior conduct of the plaintiff was a motivating factor in the decision of the Board members to fire him. Plaintiff elicited testimony in a deposition of the Superintendent of the Plainfield Public Schools, Albert Mizak, in which Mizak acknowledged that plaintiff's outside political activities were considered a "problem" by Mizak and by people in the community at large. *See* Deposition of Albert Mizak at 25–26. Mizak indicated that, in his opinion, plaintiff's outside political activities would be less likely to be accepted in the area of Plainfield than in other more liberal areas. *See id.* at 27, 32. Statements such as these indicate the possibility that plaintiff's outside activities *may* have played a significant role in the attitude of members of the community, including the Board members, regarding whether the plaintiff should have been terminated as a teacher at the Plainfield Public Schools. Though Mizak himself was not a member of the Board of Education, and thus did not formally vote at the termination hearing, it is not impossible that like-minded members on the Board who had selected him as Superintendent of Schools might have been influenced in their termination decision by plaintiff's outside political activities. Since defendants concede that plaintiff's communist affiliation was "common knowledge," Memorandum in Support of Defendants' Motion for Summary Judgment at 13, for purposes of summary judgment it would not be totally farfetched to acknowledge that plaintiff might be able to establish at trial that members of the Board were influenced by this knowledge in deciding to terminate plaintiff from his position.

This in no way implies that plaintiff has carried his burden of proof, as required by *Mt. Healthy*, of establishing that his protected activities were a "motivating" factor in the Board's decision, but simply that plaintiff has succeeded in raising a genuine triable issue of fact as to the motivation of the board members at the time of the termination vote. The fact that those members of the Board who voted to terminate plaintiff's employment have submitted affidavits that their decision was based solely on the evidence adduced at the hearing, and not on prejudice or bias toward the plaintiff or his political beliefs or associations, is not sufficient to support the defendants' motion for summary judgment. As a general rule, summary judgment is to be used sparingly "where motive and intent play leading roles." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *see* cases cited *infra.*

Under functionally similar circumstances, the District of Columbia Court of Appeals recently reversed a grant of summary judgment for the employer stating,

"[The employee's] termination was not an *overt* retaliation for engaging in protected activities, if it was a retaliation at all. . . . His only likely avenue of success lay in making credibility an issue, for resolution of the first amendment issue essentially required a determination of state of mind [of the employer]. When motivation is involved and credibility becomes of critical importance, or when essential facts are solely within the control of the moving party, summary judgment generally is inappropriate."

*Mazaleski v. Treusdell*, 562 F.2d 701, 717 (D.C.Cir. 1977) (emphasis in original).

In the instant case I am persuaded to follow this rule—that summary judgment is generally not appropriate where the motive or state of mind of the moving party is in issue—under the rationale developed in sup-

port of the rule in prior cases in this circuit. *See, e. g., Friedman v. Meyers,* 482 F.2d 435 (2d Cir. 1973); *Cali v. Eastern Airlines, Inc.,* 442 F.2d 65, 71 (2d Cir. 1971); *Union Insurance Soc. of Canton, Ltd. v. Wm. Gluckin & Co.,* 353 F.2d 946, 951 (2d Cir. 1965); *Cross v. United States,* 336 F.2d 431, 433 (2d Cir. 1964); *Subin v. Goldsmith,* 224 F.2d 753, 758–59 (2d Cir. 1955). In the last-cited case, uncontroverted affidavits of the movants were considered insufficient to support summary judgment on the ground that the credibility of the affiants raised a triable issue since the facts in issue were particularly within the knowledge of the movants. *See also Glomac Plastics, Inc. v. NLRB,* 592 F.2d 94, 99 (2d Cir. 1979) (finder of fact permitted not only to find witness' testimony false but that "the truth is the opposite of his story").

I am not unmindful that the principle applied by this decision may leave the courts open to time-consuming and often fruitless attempts to impeach the integrity of decision makers, *see Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975) (there is a "presumption of honesty and integrity in those serving as adjudicators"), but judicial economy must take a subordinate role in cases where state officials are alleged to have retaliated against employees for their exercise of first amendment rights. In such cases, the courts have shown a zealous regard for the protection of the constitutional right to freedom of speech. Thus the opportunity to prove the denial of this constitutional right should not be narrowly restricted by the policy underlying the summary judgment rule. It follows that the defendants' motion for summary judgment must also be denied.

For all of the foregoing reasons, both the plaintiff's and the defendants' motions for summary judgment are denied.

SO ORDERED.

### ON THE MERITS

This is the final stage in the case of Philip Burns, a tenured fifth-grade teacher in the Plainfield, Connecticut school system whose employment contract was terminated by a vote of the defendant Plainfield Board of Education (the Board) in December of 1975. Shortly after the contract termination, plaintiff Burns brought an action in this court alleging that the Board's action violated his rights under the first and fourteenth amendments to the United States Constitution.

A hearing on plaintiff's motion for a preliminary injunction was held on January 26 and 27, 1976. That motion was denied for lack of a showing of irreparable injury. *See* Ruling on Motion for Preliminary Injunction, filed March 3, 1976. Thereafter the parties filed cross-motions for summary judgment on the basis of accompanying affidavits and on the basis of the evidence presented at the hearing on the preliminary injunction. In ruling on the cross motions, this court found that permissible reasons existed for the Board's decision to dismiss plaintiff from employment as a teacher. Ruling on Cross-Motions for Summary Judgment, 477 F.Supp. 270 (D.Conn. 1979). Since all of the facts up until the time the Board voted to terminate the plaintiff's employment are stated in that ruling, and what slight additional or repetitive evidence relating to them introduced at the trial did not modify them in any significant way, the facts set forth in that opinion are incorporated herein by reference. *See* Fed.R.Civ.P. 65(a)(2).

The only issue left unresolved by that opinion was the *"Mt. Healthy* issue": whether conduct of Burns outside of the classroom, which was constitutionally protected, was a motivating factor in the Board's decision to discharge him. *See* Ruling on Cross-Motions for Summary Judgment. This issue was left unresolved because there existed a genuine issue of fact as to what factors motivated the Board's decision. To resolve this issue, a trial on the merits of plaintiff's complaint was held on June 26, 1979.[1]

---

1. In deference to the plaintiff's request, the hearing on his application for a preliminary injunction was not consolidated with the trial on the merits under Rule 65(a)(2), Fed.R.Civ.P.

### Discussion

■ Under the rule of *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), in order to establish a violation of first amendment rights, the initial burden of proof is on the discharged employee "to show [not only] that his conduct was constitutionally protected, [but also] that this conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the Board's decision . . . ." *Id.* at 287, 97 S.Ct. at 576. Plaintiff has failed to meet this initial burden of proof.

The decision of the Board to discharge plaintiff, which plaintiff challenges in this action, was made by a unanimous vote of six members of the Board. Plaintiff called as witnesses five of those six: Board members Dumaine, Yonta, Tetreault, Nicholson, and Krecidlo. Plaintiff elicited no testimony from any of these witnesses indicating that any of plaintiff's out-of-classroom political activities—such as his membership in the Progressive Labor Party or his participation in leafletting activities—were a motivating factor in their decision to terminate plaintiff's employment contract.

Plaintiff argues, however, that the "minutes" of the December 1975 Board meeting, which followed the public hearing on the charges brought against the plaintiff, reveal that his protected first amendment conduct did play an important role in the Board's decision. The minutes of that meeting state that plaintiff was found guilty by the Board members on four counts:

"1st count: Violation of administrative directive (insubordination) Vote was unanimous.

"2nd count: Classroom used to disseminate political views (incompetence) Vote was unanimous.

"3rd count: Ms. Kingsley's visit to Memorial School (insubordination) Vote was unanimous.

"4th count: Passing out of leaflets to students and other [*sic*] (incompetence

and insubordination). Vote was unanimous."

Plaintiff's Trial Exh. 1. Plaintiff argues that the "fourth count" listed in the minutes involved protected first amendment conduct, and that this was a substantial factor in the Board's decision to discharge him.

The evidence does not support plaintiff's argument. The Board's formal "Findings of Fact and Conclusions" make no mention of plaintiff's leafletting activities. *See* Plaintiff's Trial Exh. 6. The Board's formal findings and conclusions only make reference to the pen-pal incident, plaintiff's interruption of another teacher's classroom, and plaintiff's disregard of a directive of the school principal, *see id.*,—conduct which I have previously held to be a permissible basis for plaintiff's discharge. *See* Ruling on Cross-Motions for Summary Judgment. In light of the testimony presented at the trial on June 26, 1979, the most reasonable explanation for the absence of any mention of plaintiff's leafletting activities in the "Findings of Fact and Conclusions" of the Board is that these activities played no significant role in the Board's decision. All five of the Board members who were called as witnesses testified that, to the best of their recollection, they did not base their decision to discharge plaintiff on plaintiff's leafletting activities. To the extent that the Board members could remember their reasons for voting to discharge plaintiff, they testified that the reasons were the pen-pal incident and plaintiff's disregard for the authority of the school principal.

Plaintiff asks this court not only to disbelieve the testimony of all of these witnesses but to believe the opposite, that plaintiff's outside political activities were a major factor in the Board members' decision to discharge plaintiff. Nothing in the demeanor of these witnesses on the witness stand, and nothing elicited during plaintiff's examination of these witnesses, leads this court to discredit any of the witnesses' testimony. Thus I find that plaintiff has not proven by a preponderance of the evidence, as is his

burden, that a "substantial" or "motivating" factor in the Board's decision to discharge him was his protected first amendment conduct.[2] Accordingly, judgment shall enter for the defendants on the complaint.

The foregoing shall constitute the court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52.

SO ORDERED.

---

**2.** Furthermore, it is not at all certain that the leafletting referred to in the fourth count of the minutes was protected first amendment conduct since it is unclear whether the count refers to leafletting in or outside the classroom. However, I need not decide this issue given my ruling that this conduct was not a motivating factor in the Board's decision to discharge plaintiff.