Jacqueline FOWLER, Plaintiff-Appellee, Cross-Appellant,

v.

The BOARD OF EDUCATION OF LINCOLN COUNTY, KENTUCKY; Joseph G. Blair, Individually and As Superintendent of the Lincoln County Schools; Lloyd McGuffey; Jimmy Cooper; Ivan Singleton; Tom Blankenship; and Paul Playforth, Individually and Each in His Official Capacities, Respectively, As a Member of the Board of Education of Lincoln County, Kentucky, Defendants-Appellants, Cross-Appellees.

Nos. 85–5815, 85–5835.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 17, 1987.

Decided June 1, 1987.

Rehearing and Rehearing En Banc Denied July 21, 1987.

James W. Williams, III, Rankin, Baker and Williams, Stanford, Ky., Robert L. Chenoweth, Bryan, Fogle and Chenoweth, Mt. Sterling, Ky., F.C. Bryan, John C. Fogle, argued, Mt. Sterling, Ky., for defendants-appellants, cross-appellees.

Arthur L. Brooks, Jane V. Fitzpatrick, Brooks, Coffman and Fitzpatrick, Lexington, Ky., Walter Alan Kamiat, argued, Bredhoff & Kaiser, Washington, D.C., for plaintiff-appellee, cross-appellant.

Before MERRITT and MILBURN, Circuit Judges, and PECK, Senior Circuit Judge.

MILBURN, Circuit Judge.

Defendants, The Board of Education of Lincoln County, Kentucky, individual board members, and the Superintendent of the Lincoln County Schools, appeal from the judgment of the district court awarding reinstatement and damages to plaintiff Jacqueline Fowler on the ground that her employment was terminated in violation of her First Amendment rights. Plaintiff cross-appeals on the ground that K.R.S. § 161.-790(1), which proscribes conduct unbecoming a teacher, is unconstitutionally vague as applied to her conduct. For the reasons that follow, we vacate the judgment of the district court and dismiss plaintiff's action.

### I.

Plaintiff Jacqueline Fowler was a tenured teacher employed by the Lincoln County, Kentucky, school system for fourteen years. She was discharged in July, 1984 for insubordination and conduct unbecoming a teacher. The basis for this action was that she had an "R" rated movie, *Pink Floyd—The Wall*, shown to her high school students on the last day of the 1983–84 school year. The students in Fowler's classes were in grades nine through eleven and were of the ages fourteen through seventeen.

The day on which the movie was shown, May 31, 1984, was a noninstructional day used by teachers for completing grade cards. A group of students requested that Fowler allow the movie to be shown while she was completing the grade cards. Fowler was unfamiliar with the movie and asked the students whether it was appropriate for viewing at school. Charles Bailey, age fifteen, who had seen the movie on prior occasions, indicated that the movie had "one bad place in it." Joint Appendix at 291.

Fowler rented the video tape at a video store in Danville, Kentucky. The clerk who rented the "R" rated tape to Fowler told her that there was some nudity in the movie during a song called "Young Lust" and warned that she might wish to delete that section. Joint Appendix at 82–83. However, Fowler did not preview the movie before having it shown to her morning class because the store did not have a tape compatible with her own VCR and because she did not have time to make other arrangements to preview the movie. Joint Appendix at 83, 103, 307.

When Fowler had the movie shown on the morning of May 31, 1984, she instructed Charles Bailey, the fifteen-year-old student who had seen the movie, to edit out any parts that were unsuitable for viewing at school. He did so by attempting to cover the 25″ screen with an 8½″ by 11″ letter-sized file folder. Joint Appendix at 83–84.

There is conflicting testimony as to whether, or how much, nudity was seen by the students. At the administrative hearing, several students testified that they saw no nudity. Joint Appendix at 265–89. One student testified that she saw "glimpses" of nudity, but "nothing really offending." Joint Appendix at 321. Assistant Principal Michael Candler, who observed the movie during part of the afternoon showing, testified that Charles Bailey's ed-

iting attempt was not sufficient to preclude the students from seeing the nudity. Joint Appendix at 242–46. On cross-examination, Charles Bailey testified that Mrs. Fowler told him to open the file folder while editing after Candler entered the room. Trial Transcript Vol. I at 108–09. It is undisputed that the audio portion of the movie, which contained enough offensive language to mandate an automatic "R" rating under motion picture industry standards, was played through the entire movie. Joint Appendix at 114, 186–87.

There is also conflicting testimony regarding the amount of sexual innuendo existing in the "unedited" version of the film. Because some parts of the film are animated, they are susceptible to varying interpretations. One particularly controversial segment of scenes is animated in which flowers appear on the screen, are transformed into the shape of male and female sex organs and then engage in an act of intercourse. This segment of the film was shown in the morning session. Joint Appendix at 120–22. Other segments involving a violent rape, nudity, a suggestion of oral sex, and a naked woman and naked man in bed engaging in foreplay and intercourse were also shown in the morning. Trial Transcript Vol. I at 101.[1]

Once again, there is conflicting testimony concerning the effectiveness of the editing attempt. Moreover, there is testimony supporting the fact that more editing was done in the afternoon showing than in the morning showing.[2]

In addition to the sexual aspects of the movie, there is a great deal of violence. One scene involves a bloody battlefield. Joint Appendix at 129–30. Another shows police brutality. Joint Appendix at 132–33. Another shows the protagonist cutting his chest with a razor. Joint Appendix at 127. Another scene shows children being fed into a giant sausage machine. Joint Appendix at 137.

On the afternoon of May 31, 1984, Principal Jack Portwood asked Fowler to give him the video tape, and she did so. After the movie was viewed by the superintendent and members of the Lincoln County Board of Education, proceedings were instituted to terminate Fowler's contract.

Plaintiff Fowler received her termination notice on or about June 19, 1984. The notice advised her that a hearing would be held on July 10, 1984, and she subsequently advised the board of her intention to appear at the hearing and contest the charges.

On July 10, 1984, plaintiff Fowler appeared with counsel at the administrative hearing. She testified that, despite the fact that she had never seen the movie before having it shown to her students, and despite the fact that she was posting grades on report cards and left the room several times while the movie was being shown, she believed it had significant value. She believed the movie portrayed the dangers of alienation between people and of repressive educational systems. She testified that she would show an edited

---

**1.** The district court found that the movie "contains a very limited amount of material which is sexually suggestive," that the movie does not contain "any 'simulation' of a sexual act," and that "any scenes involving nudity or suggestive conduct were edited from the view of students" during both showings. District Court Opinion at 6. We have viewed the film in conjunction with Fowler's testimony concerning the portions of the film which were edited during the two showings, and we conclude that the district court's findings in this regard are clearly erroneous. Similarly, his finding that Fowler formed an opinion regarding the significance of the film during the morning showing is clearly erroneous. It is undisputed that Fowler left the room several times while the movie was being shown, and that she was posting grades during the time she was present in the classroom.

Having considered the entire record, including the viewing of the movie, and in holding that the district court's findings of fact are clearly erroneous, we are left with a "definite and firm conviction that ... mistake[s] ha[ve] been committed." See *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), and *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512–13, 84 L.Ed.2d 518 (1985).

**2.** Fowler testified that she left the classroom on several occasions while the movie was being shown. Joint Appendix at 113–14. However, she stated that she believed Charles Bailey when he told her that he continued to edit while she was gone. Joint Appendix at 308–09.

version of the movie again if given the opportunity to explain it. She stated that she did not at any time discuss the movie with her students because she did not have enough time.

The board viewed the movie once in its entirety and once as it had been edited in the classroom. The board then retired into executive session. Following this executive session, the board returned to open session and voted unanimously to terminate plaintiff's employment for insubordination and conduct unbecoming a teacher.

Following her termination, plaintiff Fowler initiated her action in the district court alleging that her First and Fourteenth Amendment rights were violated by her discharge, and that the Kentucky statutes forming the basis for her discharge were unconstitutionally vague or overbroad. She also alleged that the factual findings made in support of her discharge were not supported by substantial evidence.

At the bench trial in the district court, Fowler repeated her contention that she believed the movie contained important, socially valuable messages. School officials testified that they objected to the movie because it promoted values which were described as immoral, antieducation, antifamily, antijudiciary, and antipolice. Joint Appendix at 198, 200, 204, 207, 212, 223, 249–50, 255. They also found the movie objectionable because of its sexual content, vulgar language, and violence. Joint Appendix at 199, 201, 207, 212–13, 223, 226, 251.[3]

The district court concluded that Fowler's conduct was protected by the First Amendment, and that she was discharged for exercising her constitutionally protected rights. Consequently, it awarded her reinstatement, back pay with interest, reimbursement of funds necessary for her reinstatement with the Kentucky Teachers Retirement System, damages for emotional distress and damage to professional reputation, compensatory damages for costs incurred in seeking new employment, costs, and attorney's fees.

The district court concluded that Fowler was not insubordinate because she did not violate an established rule or regulation, and also found that plaintiff's due process rights were not violated by the procedures utilized at the administrative hearing. Finally, the district court concluded that K.R.S. § 161.790(1)(b) was not vague or overbroad, apparently for the reason that, because Fowler's conduct was protected by the First Amendment, such conduct "as a matter of fact and law did not constitute conduct unbecoming a teacher." District Court Opinion at 23.

In this appeal, defendants contend that the district court erred in its conclusion that plaintiff's discharge violated her First Amendment rights. Plaintiff cross-appeals from the holding that K.R.S. § 161.-790(1)(b) is not unconstitutionally vague.

## II.

### A.

In its opinion, the district court relied upon the analytical framework provided by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Under the *Mt. Healthy* standard, a public employee establishes a prima facie case of a constitutional violation if she shows that she was engaged in protected activity, and that such activity was a substantial or motivating factor in the decision to terminate her employment. *Id.* at 287, 97 S.Ct. at 576. In order to defend itself against such a claim, the government must establish by a preponderance of the evidence that the decision to terminate would have been made in the absence of the exercise of the constitutionally protected right. *Id.*

In the present case, it is undisputed that plaintiff's employment was terminated be-

---

**3.** To the extent that the district court's finding of fact number 34 may be interpreted as a finding that the defendants objected to the film only on an ideological level, the finding is clearly erroneous. The record is replete with testimony indicating that school officials objected to the sexual content, vulgarity, and violence contained in the movie.

cause she had the "R" rated movie shown to her students and because she said she would do it again. Consequently, the focus of our inquiry is whether Fowler's conduct was constitutionally protected.

The Supreme Court has consistently recognized the importance of the exercise of First Amendment rights in the context of public schools.

First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years.

*Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Many courts have recognized that a teacher's First Amendment rights encompass the notion of "academic freedom" to exercise professional judgment in selecting topics and materials for use in the course of the educational process. *See, e.g., Stachura v. Truszkowski,* 763 F.2d 211, 215 (6th Cir.1985), *rev'd in part on other grounds,* — U.S. ——, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Kingsville Independent School District v. Cooper,* 611 F.2d 1109, 1113 (5th Cir.1980); *Cary v. Board of Education,* 598 F.2d 535, 539–42 (10th Cir.1979); *Keefe v. Geanakos,* 418 F.2d 359, 362 (1st Cir. 1969); *Dean v. Timpson Independent School District,* 486 F.Supp. 302, 307 (E.D. Tex.1979). *See generally Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967) (discussing importance of academic freedom).

Among the "special circumstances" which must be considered in defining the *scope* of First Amendment protection inside the classroom is the "inculcat[ion of] fundamental values necessary to the maintenance of a democratic political system." *Bethel School District No. 403 v. Fraser,* — U.S. ——, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986) (quoting *Ambach v.*

*Norwick,* 441 U.S. 68, 76–77, 99 S.Ct. 1589, 1594–95, 60 L.Ed.2d 49 (1979)).

Indeed, the "fundamental values necessary to the maintenance of a democratic political system" disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the "work of the schools."

*Fraser,* 106 S.Ct. at 3165 (quoting *Ambach,* 441 U.S. at 76–77, 99 S.Ct. at 1594–95, and *Tinker,* 393 U.S. at 508, 89 S.Ct. at 737).

The single most important element of this inculcative process is the teacher. *"Consciously or otherwise, teachers ... demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class. Inescapably, like parents, they are role models." Fraser,* 106 S.Ct. at 3165 (emphasis supplied). *See also Ambach,* 441 U.S. at 76–77, 99 S.Ct. at 1594–95. *"To regard teachers—in our entire educational system, from the primary grades to the university—as the priests of our democracy is therefore not to indulge in hyperbole." Wieman v. Updegraff,* 344 U.S. 183, 196, 73 S.Ct. 215, 221, 97 L.Ed. 216 (1952) (Frankfurter, J., concurring) (emphasis supplied).

The accommodation of these sometimes conflicting fundamental values has caused great tension, particularly when the conflict arises within the classroom. *See, e.g., Martin v. Parrish,* 805 F.2d 583 (5th Cir. 1986); *Zykan v. Warsaw Community School Corp.,* 631 F.2d 1300 (7th Cir.1980); *Russo v. Central School District No. 1,* 469 F.2d 623 (2d Cir.1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973); *James v. Board of Education,* 461 F.2d 566 (2d Cir.), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972). In the final analysis,

[t]he ultimate goal of school officials is to insure that the discipline necessary to the proper functioning of the school is maintained among both teachers and students. Any limitation on the exercise of

constitutional rights can be justified only by a conclusion, based upon reasonable inferences flowing from concrete facts and not abstractions, that the interests of discipline or sound education are materially and substantially justified.... "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*James*, 461 F.2d at 571–72 (quoting *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)); *see also Anderson v. Evans*, 660 F.2d 153, 157 (6th Cir.1981); *Russo*, 469 F.2d at 631.

In the present case the district court concluded that Mrs. Fowler was entitled to the protection of the First Amendment *while acting as a teacher.* That a teacher does have First Amendment protection under certain circumstances cannot be denied. *See Tinker*, 393 U.S. at 506, 89 S.Ct. 736; *James*, 461 F.2d at 571. Likewise, a motion picture is a form of expression which may be entitled to the protection of the First Amendment. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02, 72 S.Ct. 777, 780–81, 96 L.Ed. 1098 (1952).

■ However, I conclude that Fowler's conduct in having the movie shown under the circumstances present here did not constitute expression[4] protected by the First Amendment.[5] It is undisputed that Fowler was discharged for the showing of the movie, *Pink Floyd—The Wall.* Such conduct, under the circumstances involved, clearly is not "speech" in the traditional sense of the expression of ideas through use of the spoken or written word.

Nevertheless, the Supreme Court has long recognized that certain forms of expressive conduct are entitled to protection under the First Amendment. *See Spence v. Washington*, 418 U.S. 405, 409–12, 94 S.Ct. 2727, 2729–31, 41 L.Ed.2d 842 (1974) (per curiam) (display of flag with peace symbol attached was expressive conduct entitled to protection under First Amendment); *Tinker*, 393 U.S. at 505, 89 S.Ct. at 736 (wearing black armband was conduct akin to pure speech); *Brown v. Louisiana*, 383 U.S. 131, 141–42, 86 S.Ct. 719, 724, 15 L.Ed.2d 637 (1966) (sit-in by black students in "whites only" library was symbolic speech); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 633–34, 63 S.Ct. 1178, 1183, 87 L.Ed. 1628 (1943) (flag salute is a form of expression); *Stromberg v. California*, 283 U.S. 359, 368–69, 51 S.Ct. 532, 535–36, 75 L.Ed. 1117 (1931) (display of red flag is expressive conduct).

However, not every form of conduct is protected by the First Amendment right of free speech.

To determine whether [plaintiff's] conduct is entitled to first amendment protection, "the nature of [plaintiff's] activity, combined with the factual context and environment in which it was undertaken" must be considered. *Spence v. Washington*, 418 U.S. 405, 409–10, 94 S.Ct. 2727, 2729–30, 41 L.Ed.2d 842 (1974). If [plaintiff] shows "[a]n intent to convey a particularized message ... and in the sur-

---

**4.** Whether a certain activity is entitled to protection under the First Amendment is a question of law. *See, e.g., Stern v. Shouldice*, 706 F.2d 742 (6th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 683 (1983).

**5.** Plaintiff relies on *Minarcini v. Strongsville City School District*, 541 F.2d 577 (6th Cir.1976), for the proposition that students in a public school have a constitutionally protected right "to receive information which they and their teachers desire them to have." *Id.*, at 583. In *Minarcini*, this court held that this "right to know" was violated by the removal of library books solely on the basis of the social and political tastes of the school board. The existence of such a "right

to know" was considered by the Supreme Court in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). Only three justices agreed that students possess a constitutionally protected entitlement to access to particular books in the school's library. *Id.*, at 863–69, 102 S.Ct. at 2806–09. Moreover, even these three justices explicitly noted that the decision regarding this right did not extend to the classroom. *Id.*, at 862, 869, 102 S.Ct. at 2805–06, 2809. For similar reasons, plaintiff's reliance on *Pratt v. Independent School District No. 831*, 670 F.2d 771 (8th Cir.1982) is misplaced.

rounding circumstances the likelihood was great that the message would be understood by those who viewed it," *id.* at 410–11, 94 S.Ct. at 2730–31, the activity falls within the scope of the first and fourteenth amendments.

*Monroe v. State Court of Fulton County,* 739 F.2d 568, 571 (11th Cir.1984). *Cf. Jarman v. Williams,* 753 F.2d 76, 77–78 (8th Cir.1985) (nonexpressive dancing constitutes conduct not entitled to protection of the First Amendment).

In the present case, it is undisputed that Fowler did not see the movie before she had it shown to her class on the morning of May 31, 1984, a noninstructional day.[6] Fowler agreed to allow the movie to be shown, at the students' request, because May 31 was "their treat type of day." Joint Appendix at 291. It is also undisputed that she left the room on several occasions while the film was being shown. Under circumstances such as these, I cannot conclude that Fowler possessed "[a]n intent to convey a particularized message" to her students. *Spence,* 418 U.S. at 410, 94 S.Ct. at 2730. The mere fact that at some point she may have developed an approval of the content of the movie is not, standing alone, a sufficient basis for the conclusion that her conduct in having the movie shown was a form of expression entitled to protection under the First Amendment.

> If any sort of conduct that people wish to engage in is to be considered "speech" simply because those who engage in conduct are, in one sense, necessarily expressing their approval of it, the line between "speech" protected by the First Amendment and conduct not so protected will be destroyed.

*Jarman,* 753 F.2d at 78.

Moreover, the surrounding circumstances in the present case indicate that there was little likelihood "that the message

would be understood by those who viewed it." *Spence,* 418 U.S. at 411, 94 S.Ct. at 2730. As we have noted, the "R" rated movie was shown on a noninstructional day to students in Fowler's classes in grades nine through eleven who were of ages ranging from fourteen through seventeen. Furthermore, Fowler never at any time made an attempt to explain any message that the students might derive from viewing the movie.

Thus, this case is distinguishable from those in which the Supreme Court has afforded First Amendment protection in cases involving expressive conduct. In *Spence,* the undisputed facts established that the appellant hung a United States flag with a peace symbol affixed to it because he "wanted people to know that [he] thought America stood for peace." 418 U.S. at 409, 94 S.Ct. at 2730. Moreover, in *Spence*

> appellant's activity was roughly simultaneous with and concededly triggered by the Cambodian incursion and the Kent State tragedy, also issues of great public moment.... A flag bearing a peace symbol and displayed upside down by a student today might be interpreted as nothing more than bizarre behavior, but it would have been difficult for the great majority of citizens to miss the drift of appellant's point at the time that he made it.

*Id.,* at 410, 94 S.Ct. 2730 (citation omitted). Because the intent to express was coupled with a great likelihood that the message would be understood, the Court concluded that the conduct was entitled to protection under the First Amendment.

Similarly, in *Tinker,* the uncontroverted evidence showed that the students who wore the black armbands were engaged in an expression of opposition to the Vietnam

---

**6.** Plaintiff's reliance upon cases grounded in the concept of "academic freedom," *e.g., Cooper,* 611 F.2d at 1113; *Dean,* 486 F.Supp. at 307; *Parducci v. Rutland,* 316 F.Supp. 352, 356 (M.D.Ala. 1970), is misplaced. These cases are based upon the notion that teaching is a form of activity protected by the First Amendment. We do not intimate that a teacher is entitled to the protection of the First Amendment *only* when

teaching. *See, e.g., Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mt. Healthy,* 429 U.S. at 282–84, 97 S.Ct. at 573–74. However, the fact that Fowler's conduct was unrelated to the educational process does remove it from the protection afforded by the concept of academic freedom.

war, which the Court concluded was akin to "pure speech." 393 U.S. at 505–08, 89 S.Ct. at 736–37. *See also James,* 461 F.2d at 568–69. And in *Barnette,* the court recognized that a flag salute is a form of communicative conduct which implicates the First Amendment. 319 U.S. at 632, 63 S.Ct. at 1182.

■ The cases just discussed demonstrate that conduct is protected by the First Amendment *only* when it is expressive or communicative in nature.[7] In the present case, because plaintiff's conduct in having the movie shown cannot be considered expressive or communicative, under the circumstances presented, the protection of the First Amendment is not implicated. *See Jarman,* 753 F.2d at 77.[8]

### B.

Plaintiff argues that Ky.Rev.Stat. § 161.-790(1)(b), which proscribes "conduct unbecoming a teacher," is unconstitutionally vague as applied to her because the statute failed to give notice that her conduct would result in discipline. We find this argument to be without merit.

The vagueness doctrine requires that a statute proscribing certain conduct must be drafted "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct.

2294, 2299, 33 L.Ed.2d 222 (1972); *511 Detroit Street, Inc. v. Kelley,* 807 F.2d 1293, 1295 (6th Cir.1986).

The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing ... statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.

*Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972). The fundamental principles of due process are violated only when "a statute ... either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

In the context of statutory provisions governing employee discipline, the Supreme Court has recognized the inherent difficulty in drawing statutes which are broad enough to cover a wide range of conduct, yet narrow enough to give fair warning. In *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Court concluded that the term "such cause as will promote the efficiency of the service" was not an unconstitutionally vague standard for employee discharge.

[T]here are limitations in the English language with respect to being both specific

---

**7.** Even when the actor *does* intend to communicate a message by his conduct, a governmental interest in regulating the nonspeech aspect of such conduct may justify incidental restrictions on the speech aspect as well. The Supreme Court has recognized that not every form of "conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *O'Brien,* 391 U.S. at 376, 88 S.Ct. at 1678.

**8.** The dissent relies upon *Schad v. Mt. Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), and *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), for the general proposition that entertainment enjoys First Amendment protection. While this is a general principle of law espoused by the Supreme Court on several occa-

sions, the Court has also indicated that in determining whether a given type of entertainment is protected by the First Amendment, it will look to the kind of entertainment involved and the appropriateness of the entertainment under the circumstances such as the time and place where offered. In my view, both of the cases cited by the dissent are inapposite. Rather, the proper focus of our inquiry is whether Fowler was engaged in expressive activity protected by the First Amendment, and nothing in the record would indicate that she was so engaged. In my view, the facts of the present case do not fit any of the Supreme Court cases that have been decided to date. We emphasize that our decision in this case is limited to the peculiar facts before us.

and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.

*Id.*, at 159, 94 S.Ct. at 1647 (quoting *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 578–79, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973)). "[I]t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees includes 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.' " *Arnett*, 416 U.S. at 161, 94 S.Ct. at 1648 (quoting *Meehan v. Macy*, 392 F.2d 822, 835 (D.C.Cir.1968), *modified*, 425 F.2d 469 (D.C.Cir.), *aff'd en banc*, 425 F.2d 472 (D.C. Cir.1969)).

A number of courts have rejected vagueness challenges when an employee's conduct clearly falls within a statutory or regulatory prohibition. For example, in *Frison v. Franklin County Board of Education*, 596 F.2d 1192 (4th Cir.1979), a teacher was demoted after an incident in which she disciplined students caught passing notes by reading the note in class and explaining "that three vulgar colloquialisms contained in the note were not obscene when used in different contexts." *Id.*, at 1193. She argued that the statute governing her demotion, which required teachers to maintain discipline and encourage morality, failed to give adequate notice that her conduct was a ground for discipline. The court disagreed, concluding that "[t]he regulations prescribing a teacher's speech and conduct are necessarily broad; they cannot possibly mention every type of misconduct." *Id.*, at 1194. Under the circumstances of that case, the court concluded that plaintiff's discharge was not constitutionally offensive.

Similarly, in *Wishart v. McDonald*, 500 F.2d 1110 (1st Cir.1974), a teacher was discharged for public displays of deviate sexual behavior under a statute proscribing "conduct unbecoming a teacher." The court rejected plaintiff's vagueness challenge on the ground that his behavior "was sufficiently odd and suggestive that the ordinary person would know, in advance, that his image as an elementary school teacher would be gravely jeopardized." *Id.*, at 1116. *See also In re Matter of Certain Complaints Under Investigation*, 783 F.2d 1488, 1512–13 (11th Cir.) (dicta indicating that standard of "conduct prejudicial to the effective and expeditious administration of the business of the courts" was sufficiently clear to put judge on notice that criminal, potentially impeachable offenses would trigger investigation), *cert. denied*, —— U.S. ——, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986); *Smith v. Price*, 616 F.2d 1371, 1379 n. 10 (5th Cir.1980) ("conduct unbecoming an officer" standard gave notice that reckless gunplay was subject to discipline); *Kannisto v. San Francisco*, 541 F.2d 841, 844–45 (9th Cir.1976) (insubordinate acts were clearly within scope of regulation governing "unofficerlike conduct"; regulation not vague as applied), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977); *diLeo v. Greenfield*, 541 F.2d 949 (2d Cir.1976) (teacher could not successfully contend that "due and sufficient cause" standard did not give notice that improper conduct toward students would result in discipline); *Kilpatrick v. Wright*, 437 F.Supp. 397 (M.D.Ala.1977) ("immorality" standard not vague as applied to teacher discharged for making sexual advances toward his students). *See also Fraser*, 106 S.Ct. at 3166 (recognizing need for flexibility in formulating school disciplinary rules).

■ In the present case, plaintiff Fowler had a fifteen-year-old student show a controversial, highly suggestive and somewhat sexually explicit movie to a group of high school students aged fourteen to seventeen. She did not preview the movie, despite the fact that she had been warned that portions were unsuitable for viewing in this context. She made no attempt at any time to explain the meaning of the movie or to use it as an educational tool. Rather, she had it shown for the purpose of

keeping her students occupied during a noninstructional day while she was involved in posting grades on report cards. We conclude that the statute proscribing "conduct unbecoming a teacher" gave her adequate notice that such conduct would subject her to discipline. Accordingly, we conclude that the statute is not unconstitutionally vague as applied to Fowler's conduct.

### C.

Finally, we must determine whether plaintiff's conduct constituted "conduct unbecoming a teacher" within the meaning of Ky.Rev.Stat. § 161.790(1)(b).[9] Our analysis is guided by two recent decisions by the Kentucky Supreme Court.

In *Board of Education v. Wood*, 717 S.W.2d 837 (Ky.1986), two tenured teachers were discharged for conduct unbecoming a teacher under section 161.790(1)(b). The evidence in *Wood* established that the teachers had been smoking marijuana with two fifteen-year-old students in the teachers' apartment. *Id.*, at 839–40.

The court noted that "[t]he evidence indicates that there was serious misconduct of an immoral and criminal nature and a direct connection between the misconduct and the teachers' work." *Id.*, at 839. The court went on to view this conduct in light of the purpose for teacher tenure.

The purpose of teacher tenure laws is to promote good order in the school system by preventing the arbitrary removal of capable and experienced teachers by political or personal whim.... A teacher is held to a standard of personal conduct which does not permit the commission of immoral or criminal acts because of the harmful impression made on the students. The school teacher has tradi-

tionally been regarded as a moral example for the students.

*Id.* Under the circumstances present, the court concluded that a discharge for conduct unbecoming a teacher could be upheld. *Id.*, at 840. *See also Board of Education v. McCollum*, 721 S.W.2d 703 (Ky.1986) (upholding discharge for conduct unbecoming a teacher when teacher filed false affidavit regarding sick leave and lied about time spent with student in course of special home instruction program).

■ In the present case, we conclude that plaintiff's conduct, although not illegal, constituted serious misconduct. Moreover, there was a direct connection between this misconduct and Fowler's work as a teacher. She introduced a controversial and sexually explicit movie into a classroom of adolescents without preview, preparation or discussion. In the process, she abdicated her function as an educator. Her having the movie shown under the circumstances involved demonstrates a blatant lack of judgment. Having considered the entire record, including the viewing of the movie, which we describe as gross and bizarre and containing material completely unsuitable for viewing by a classroom of students aged fourteen to seventeen, we conclude that such conduct falls within the concept of conduct unbecoming a teacher under Kentucky law.[10]

### III.

Accordingly, for the reasons stated, the judgment of the district court is VACATED, and this cause is DISMISSED.

JOHN W. PECK, Senior Circuit Judge, concurring.

I agree with Judge Milburn's decision that the school board's termination of Ms.

**9.** Ky.Rev.Stat. § 161.790 provides in relevant part:

(1) The contract of a teacher shall remain in force during good behavior and efficient and competent service by the teacher and shall not be terminated except for any of the following causes:
....
(b) Immoral character or conduct unbecoming a teacher....

**10.** The school board stated insubordination as an alternate ground for plaintiff's dismissal. The district court concluded that plaintiff was not insubordinate because she did not violate any established rule or regulation, nor did she refuse to obey the directions of her superiors. Because we conclude that plaintiff's discharge may be upheld under the charge of conduct unbecoming a teacher, we need not reach this issue.

Fowler's teaching contract did not violate her First Amendment right of free expression but write separately because I reach this result by a different route. In my view this case should be decided under the "mixed motive" analysis of *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977), as suggested by Judge Merritt's dissent, particularly when viewed in the context of the post-*Mt. Healthy* cases of *Board of Educ. v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), and *Bethel School Dist. v. Fraser*, — U.S. ——, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). However, for the reasons stated below I would hold that the school board properly discharged Ms. Fowler.

Judge Milburn does not inquire into the motivation of the school board but rather bases his decision on the fact that Ms. Fowler's action in showing the film to her classes was not conduct protected by the First Amendment. He finds that Ms. Fowler did not possess "[a]n intent to convey a particularized message" to her students because she was not familiar with the content of the film before she showed it, citing *Spence v. Washington*, 418 U.S. 405, 410, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974). He expresses the further view that there was "little likelihood that the message would be understood by those who viewed it," *id.*, at 411, 94 S.Ct. 2730, because Fowler did not explain the messages contained in the film to the students. I would suggest that the rationale underlying *Spence v. Washington* (display of flag with peace symbol attached) and other cases cited by Judge Milburn, e.g., *Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (sit-in by blacks at "whites only" library), *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (flag salute), are inapposite because they involve examples of symbolic expression, not verbal communication, and articulate guidelines for determining what symbolic acts *may* constitute expression. These cases do not lend themselves to the reverse purpose of defining what kind of communication can *not* be expressive. This court, in my opinion, should not

offer an advisory opinion as to what constitutes an intent to communicate and how much knowledge of the content of a presentation is needed before it can be embraced as one's own expression. The more important question is not the motive of the speaker so much as the purpose of the interference. I would also question the notion that an explanation from the teacher was necessary before the class was likely to understand the themes and viewpoints contained in this film.

The Supreme Court in *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), has acknowledged that students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." I believe a teacher should be similarly protected by the First Amendment whether she is participating in an instructional or non-instructional day. *See, e.g., Mt. Healthy City School Dist. Bd. of Educ., supra* (finding a teacher's communication with a radio station regarding school board policies was constitutionally protected activity); *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (holding that a conversation by a teacher and principal in the principal's office, a private expression by a public employee, was protected speech). Certainly there is greater cause for school board interference when acting within its discretion to establish curriculum, and therefore in requiring a teacher to follow the prescribed curriculum. *See Minarcini v. Strongsville City School Dist.*, 541 F.2d 577 (6th Cir.1976) (finding no constitutional violation in the Board's exercise of curriculum and textbook control, while, at the same time, determining that the Board had wrongly removed books from the library).

I would hold, rather, that the district court properly used the *Mt. Healthy* standard to decide whether Ms. Fowler's discharge violated the First Amendment, but erred in its finding that, but for Ms. Fowler's constitutionally protected activity of

communicating various ideas and political thoughts to her students, she would not have been fired. The Court in *Mt. Healthy* set the standard that once the plaintiff had shown that his conduct was constitutionally protected and that his conduct was a substantial or motivating factor in the Board's decision to discharge or not to rehire, the school board then must show that it would have reached the same decision even in the absence of the protected conduct. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576.

In examining the motivation of the school board, while the school board clearly expressed displeasure with the anti-establishment focus of the film, the board also found the method of the film to be highly inappropriate for its students. That method was to use sexual innuendo and sexually explicit material, some profane language, violence, and vulgar images, to tell the story of the film. The school board was also motivated by the poor judgment used by the teacher in not previewing an R-rated film and in the cavalier manner in which she allowed the film to be shown and "edited" by a student. It is speculation to say how much the school board was swayed by the fact that Ms. Fowler did not exhibit second thoughts on having shown the film, and not only did not see the "error of her ways" but said that she would show the film again if given the opportunity. The dissent accurately points out that "the school board did not like the content of the movie" but their objections to the "immoral" content of the film were intertwined with constitutionally permissible objections to the film's above mentioned vulgarity and unsuitability for the student age group and cannot survive the "but for" test of *Mt. Healthy*. Ms. Fowler's after the fact rationalizations for having shown the film cannot alter the fact that she used poor judgment and should not shield her from the consequences.

The *Mt. Healthy* case, involving actions by a teacher outside the school environment, must be viewed in light of the court's deference to the autonomy of school boards in regulating the educational process. The plurality opinion of *Pico* used the *Mt. Healthy* case as precedent to decide whether the school board in that case acted properly in removing books from the school library. Justice Brennan restated the test to decide intent and asserted:

> Thus whether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. If petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision, then petitioners have exercised their discretion in violation of the Constitution.

*Pico*, 477 U.S. at 871, 102 S.Ct. at 2810.

Justice Brennan apparently concludes that a school board may make proper objections to content that is pervasively vulgar or educationally unsuitable but warns that this may not be asserted to mask a decision interfering with the communication of political ideas with which they disagree. The objections to the method of communication in the film at issue in the present case cannot be seen as a sham or cover-up but as valid objections to a film the board thought inappropriate for classroom viewing.

The Court in the recent case of *Bethel School Dist. v. Fraser* further supported the school board's authority to take action against conduct it considered vulgar and offensive and disruptive of the educational process. 106 S.Ct. at 3165. This court need not go as far as the Court did in *Pico* and *Bethel* because those cases respectively involved school library and a school assembly and did not have the captive audience factor with the teacher acting *in loco parentis* that is present in this case.

As herein above indicated, I concur in the result reached in Judge Milburn's opinion.

MERRITT, Circuit Judge, dissenting.

Federal judges and local school boards do not make good movie critics or good censors of movie content. What one judge

sees as "gross and bizarre," another may find, as did District Judge Scott Reed below, mild and not very "sexually suggestive."

The movie here seems to me to present a message similar to that expounded by Dr. Spock: abuse of sex and drugs as well as various forms of mental instability and anti-social conduct are associated with an overly authoritarian society. The message is that unloving, overly rigid and authoritarian parents, teachers, judges and officials create disturbed individuals and societies. This lack of love is the figurative "wall" shown in the movie.

But whatever the meaning of the movie, however good or bad it may be, my main concern is that the holdings of both Judge Milburn and Judge Peck are in error. Judge Milburn makes a distinction between "academic freedom" and showing a movie in class:

> We do not intimate that a teacher is entitled to the protection of the First Amendment *only* when teaching. *However, the fact that Fowler's conduct was unrelated to the educational process does remove it from the protection afforded by the concept of academic freedom.*

Opinion of Judge Milburn at p. 663 n. 6 (emphasis added) (citations omitted). Judge Milburn states further that "plaintiff's conduct in having the movie shown cannot be considered expressive or communicative...." *Id.* at p. 664.

Purely expressive works—songs, movies and books of entertainment value only—are protected by the First Amendment just like works of moral philosophy. *See Schad v. Mt. Ephraim,* 452 U.S. 61, 65–66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981) (entertainment protected same as political or ideological speech); *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 578, 97 S.Ct. 2849, 2859, 53 L.Ed.2d 965 (1977) ("no doubt that entertainment ... enjoys First Amendment protection"). *See also Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 231, 97 S.Ct. 1782, 1797, 52 L.Ed.2d 261 (1977) ("But our cases have never suggested that expression about philosophical, social, artistic, economic, literary, or ethical matters—to take a nonexhaustive list of labels—is not entitled to full First Amendment protection.").

In fact, Mrs. Fowler was not discharged because she entertained her students: she was discharged because the school board did not like the content of the movie. Mrs. Fowler proved at trial, as Judge Milburn says at page 660 of his opinion, that she was discharged because the board members regarded the movie as "immoral, antieducation, antifamily, antijudiciary, and antipolice." There is no support for the proposition—nor does the school board argue— that a teacher's academic freedom or a student's right to hear may be abridged simply because a school board dislikes the content of the protected speech. Furthermore, since this was a "free day" for the students, no departure from a board-mandated curriculum occurred. It is obvious, therefore, that Mrs. Fowler's discharge was prompted by the content of the movie.

Assuming that the school board could have properly discharged Mrs. Fowler for poor judgment and lack of remorse in showing an "R-rated" movie which had short scenes depicting nudity and sexual foreplay, but not for the other reasons given, this case must be decided under the "mixed-motive" analysis of *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Where a plaintiff can show that her constitutionally-protected conduct was a "substantial" or "motivating" factor in the discharge decision, the employer must prove "by a preponderance of the evidence that it would have reached the same decision as to ... re-employment even in the absence of the protected conduct." *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.

Although Judge Peck's opinion concedes that "the school board clearly expressed displeasure with the anti-establishment focus of the film," he argues nonetheless that the board's "objections to the 'immoral' content of the film were intertwined with constitutionally permissible objections to the film's above mentioned vulgarity and unsuitability for the student age

group...." Opinion of Judge Peck at p. 668. I do not believe an argument based on intertwining can be used to suppress protected speech; vulgarity should not be allowed to subsume that which is protected.

In *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Supreme Court held constitutionally protected the act of wearing a jacket bearing the words "!?X! the Draft" into a courthouse corridor. Writing for the Court, Justice Harlan stated that "while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." 403 U.S. at 25, 91 S.Ct. at 1788.

Therefore, I disagree with the distinction between instruction and entertainment drawn by Judge Milburn and the conflation of vulgarity and anti-establishment ideas set forth by Judge Peck. As the District Court correctly found, the school board in this case had to negate the testimony of its own members that the determinative causative factor in Mrs. Fowler's discharge was her decision to allow "antieducation, antifamily, antijudiciary, and antipolice" views to be expressed in her classroom. The District Court held that the school board failed to carry this *Mt. Healthy* burden. I agree with both of these findings. Therefore, I would affirm the judgment of the District Court.